REHSE, Respondent, vs. INDUSTRIAL COMMISSION and another, Appellants.*

*September 13—October 8, 1957.*

---

* Motion for rehearing denied, without costs, on December 3, 1957.

622

For the appellants there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

For the respondent there was a brief by *Swan & Strub* of Beaver Dam, attorneys, and *Wilkie, Anderson & Bylsma, Horace W. Wilkie, La Follette, Sinykin & Doyle, Gordon Sinykin,* and *Walter B. Raushenbush* of counsel, all of Madison, and oral argument by *Mr. Horace W. Wilkie* and *Mr. Raushenbush.*

MARTIN, C. J.   Early in 1952 the Conservation Commission, in its operation of the Horicon Marsh Wildlife Area, gave notice that trapping for muskrat in the Area would be authorized for the period from March 15, 1952, to April 15, 1952, "for the primary purpose of reducing the muskrat population on open-water areas, in order that we may enhance emergent plant growth."

Elmer Rehse, who resided on a farm in the vicinity of the marsh and engaged in trapping, received a copy of said notice, a form letter which recited in part that since he was "awarded

a contract" during the 1951–1952 trapping season on the Horicon Marsh Wildlife Area, he was "eligible for this spring trapping season." The application form attached thereto was signed by Rehse, stating that he wished to continue to trap "under the conditions of my contract" during the 1952 special spring trapping season. This was returned to the commission and, along with the applications of other trappers, was sent to the bureau of purchases for a drawing by lot, and Rehse's application was one of about 30 so selected. Rehse then signed an agreement with the Conservation Commission which reads:

"Wisconsin Conservation Commission
Madison 2, Wisconsin

Form G–210

"Horicon Marsh Wildlife Area
Share-trapping Permit and Contract

"To whom it may concern:

"This is to certify that Elmer Rehse of Horicon, Wisconsin, is hereby permitted and authorized by the State Conservation Commission of Wisconsin, to trap muskrats and mink on the Horicon Wildlife Area on a one-half share basis.

"It is understood that the aforesaid individual, known as the contractor, shall be in possession of a Wisconsin trapping license and trap tags.

"It is understood and agreed that the ownership of all furs shall be and will remain in the state of Wisconsin until final division thereof is made.

"The above-mentioned trapping shall be confined to the area known as the Horicon Marsh Wildlife Area, and trapping Unit No. 17, 18, and shall be carried on under the terms, conditions, and regulations set forth in State Conservation Commission of Wisconsin Form No. G–166, which is made a part of this permit and contract, and to which the contractor agrees to be bound in his trapping activities.

"Any violation of chapters 23 and 29, Wisconsin statutes, Conservation Commission orders, rules and regulations, and rules and regulations listed in Form G–166 shall cause this document to become void.

"This permit and contract is not transferable, and is effective from April 1, 1952, to April 15, 1952, or until such time as the Conservation Commission terminates the same in accordance with the provisions of this contract.

"This permit shall be shown at all reasonable times to any conservation warden upon demand.

"Dated: March 28, 1952.

> "State Conservation Commission of Wisconsin
> "H. T. J. Cramer
>   Acting Conservation Director
> "Countersigned:
> "By James G. Bell
>   Wisconsin Conservation Commission
>   Supervisor, Horicon Marsh Wildlife Area
> "Elmer Rehse
>   Contractor."

Form No. G–166, which was incorporated in the permit and contract, required, among other things, that the applicant must be an experienced Wisconsin trapper and pelter; that he must furnish trapping equipment including 125 traps of a specified type, 125 muskrat-pelt stretchers, a duck skiff, three mink-pelt stretchers, a pair of hip boots; must agree to spend at least eight hours each day on his trapping unit; must notify Horicon headquarters of any intent to use helpers and get the approval of the commission for their use; must report to headquarters by 4 p. m. each day before going home or elsewhere; must comply with all state laws and regulations of the Conservation Commission. It also provided that any other animals trapped, for which there was open season, must be checked in with the trapping inspector, and pelts of foxes, raccoons, skunk, and opossum would be divided 100 per cent to the trapper, together with bounties. The division of pelts was also detailed in the regulations. The final regulation stated that "Cancellation of the trapping permit or subsequent years application for trapping permit will result as a violation of the above regulations, or for failure of trapper to make reasonable catch in assigned unit."

The evidence shows that in practice each trapper, after working on his unit, would bring the trapped animals to the marsh headquarters about 4 p. m., check them, and sign a division sheet stating the number thereof and the unit in which they were trapped. He would then take the carcasses home for pelting and stretching and on a day designated by the marsh headquarters he would bring the pelts in and they would be divided into two piles from which the Conservation Commission would choose one and the trapper would then be free to sell his share. All pelts belong to the state until the division is made.

Rehse began trapping his units on April 1, 1952, and on the 14th of that month, while returning in his skiff from his traps, he fell into the water and was drowned.

The question whether Rehse was a mere licensee, as determined by the Industrial Commission, or an independent contractor, as held by the circuit court, is a question of law. As stated in *Eckhardt v. Industrial Comm.* (1943), 242 Wis. 325, 329, 7 N. W. (2d) 841:

"If when a rule of law is applied to undisputed facts, a final conclusion results, the question presented is one of law. If something more than the application of a rule of law is required in order to reach a final conclusion, a question of fact is presented."

The primary purpose stated in the Conservation Commission's solicitation of applications to trap during the special spring season was that "of reducing the muskrat population on open-water areas, in order that we may enhance emergent plant growth." According to the testimony of James Bell, district game manager who is the supervisor of the Horicon Marsh Wildlife Area, good game management requires periodic reduction of the muskrat population in the marsh. Proper game management is the work of the Conservation Commission. It needed no license to accomplish that pur-

pose; it could have hired the trapping done in any way it saw fit. It chose to enter into an arrangement with private individuals, experienced, licensed trappers, under its "permit and contract" whereby the trapper and the state shared equally in the furs of the animals trapped. Under the terms of the "permit and contract" the trapper was assigned a definite unit or units in the marsh area and must restrict his trapping to the marsh area; he was required to provide certain equipment, to spend eight hours a day on his trapping unit, to report daily to marsh headquarters to fill out and sign a "trapper's daily fur-take receipt and report" form, to pelt the carcasses and to bring them to headquarters on a specified day for division. Until the time of division all furs remained the property of the state; when they were divided the commission took first choice of the two equal piles and the trapper was entitled to the other.

In concluding from the facts that Rehse was no more than a licensee the Industrial Commission indulged an inference which is not logical or permissible. "A licensee is broadly defined as a person who enters upon the property of another for his own convenience, pleasure, or benefit." 38 Am. Jur., Negligence, p. 765, sec. 104. In 53 C. J. S., Licenses, p. 445, sec. 1, it is stated:

"The term 'license' is not involved in uncertainty or doubt; in its general and popular sense, as used with reference to occupations and privileges, it means a right or permission granted by some competent authority to carry on a business or do an act which, without such license, would be illegal. It is a formal or official permit or permission to carry on some business or do some act which, without the license, would be unlawful, the words 'license' and 'permit' often being used synonymously."

A mere license to do a particular act does not carry with it the requirement that the licensee do such act. To hold that Rehse had no more than a right to go on the marsh area

and trap is to ignore the fact that in order to exercise that right he was required to trap eight hours a day, make a "reasonable catch," and report his activities to headquarters every day. Nor is it true that, as in the case of a mere licensee, he could retain the benefits of his trapping. What he produced was property of the state until such time as the commission divided the furs and gave him his share. The trapping he was required to do was explicitly for the benefit of the state, and his share in the division constituted his compensation.

Looking at the purpose to be accomplished in the ordinary licensor-licensee relationship, the primary benefit is to the licensee; the license is a mere sufferance on the part of the licensor. In this instance, the primary benefit was to the state; it was solely for the purposes of the commission (reduction of the muskrat population) that the trapping was allowed. The commission had to have some means of accomplishing its purposes and it employed help to do so.

Appellants argue that the designation of a licensee as a "contractor" does not change a license into a contract. It is equally true that designation of a contractor as a "licensee" does not change a contract into a license. Where, as here, all the elements of a contract are present, a contract has in law been created. We agree with the appellants that the relationship between the state and Rehse must be the relationship legally created, and that it is immaterial what the parties called themselves.

It was held by the lower court that Rehse's status was that of an independent contractor, and we agree. Sec. 102.07 (8), Stats., brought under the coverage of the Workman's Compensation Act:

"Every independent contractor who does not maintain a separate business and who does not hold himself out to and render service to the public, provided he is not himself an employer subject to this chapter or has not complied with

the conditions of subsection (2) of section 102.28, shall for the purpose of this chapter be an employee of any employer under this chapter for whom he is performing service in the course of the trade, business, profession, or occupation of such employer at the time of the injury."

Rehse did not maintain a separate business or hold himself out to the public as a professional trapper; he was not an employer subject to the act. Sec. 102.04 (1), Stats., specifically includes the state in the definition of "employer" subject to the act. Sec. 102.07 (8), enacted in 1939, amended the act to extend coverage to the independent contractors therein defined as employees, but its enactment in no way changed the definition of "employer." Had the legislature intended the state to be exempt as employer in the case of an independent contractor, it would have so provided.

Appellants maintain that the circuit court had no jurisdiction to make a finding that Rehse was a state employee under sec. 102.07 (8), Stats. The Industrial Commission erred in finding that he was no more than a licensee. In reversing that finding on review, the question arose as to what the relationship between Rehse and the state was. Where, as here, the question whether a legal relationship of employer and employee existed is a question of law, a determination of the question by the court makes it the duty of the Industrial Commission, on remand for further proceedings, to find the fact in accordance with that determination. *Standard Oil Co. v. Industrial Comm.* (1940), 234 Wis. 498, 291 N. W. 826.

Appellants also submit that any attempt of the Conservation Commission to engage an independent contractor would be illegal as a device to circumvent the civil-service law. The only Wisconsin case cited is *Sullivan v. Baker* (1935), 217 Wis. 306, 258 N. W. 617, where suit was brought by a teacher against the president of a state normal school on an alleged oral agreement to pay her special compensation for

managing a cafeteria. The case was here on demurrer and it was held that there was no personal liability on the part of the defendant. The situation is not similar to that in the instant case. Here we have a state department charged by law with the performance of certain duties and functions, and under sec. 23.11 (1), Stats., "said commission is granted such further powers as may be necessary or convenient to enable it to exercise the functions and perform the duties required of it by this chapter and by other provisions of law." We consider the statute sufficiently broad to permit the Conservation Commission to enter into contracts as it did in this instance. And, having entered into the contract, the state is responsible under sec. 102.07 (8).

*By the Court.*—Judgment affirmed.