**In re Nicholas Joseph KEDROWSKI and Nyree Dawn Kedrowski, Debtors.**

No. 00–54870–7.

United States Bankruptcy Court, W.D. Wisconsin.

Aug. 28, 2002.

**440**

George B. Goyke, Byrne, Goyke, Tillisch & Higgins, S.C., Wausau, WI, for debtors.

Mark J. Wittman, Gorski & Wittman, S.C., Marshfield, WI, trustee.

### MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

THOMAS S. UTSCHIG, Bankruptcy Judge.

"Property," James Madison once wrote, "embraces everything to which a man may attach value and have a right."[1] That concept is at the heart of this case, which also features a maze of intersecting principles regarding Native American tribal sovereignty, federal oversight of tribal gaming, and bankruptcy law. While the matter presents a rather novel issue of first impression in this Court, it is an issue that may see significant development in future years if tribal gaming revenues continue to increase.[2] The debtor, Nyree Kedrowski, is a member of the Ho–Chunk Nation, and as such receives a "per capita" distribution from the tribe's gaming activities. The question before the Court is whether her entitlement to this "per capita" distribution constitutes a property right which is encompassed by the bankruptcy code's definition of "property of the estate." If so, it is an asset that is subject to the dominion and control of the bankruptcy trustee. The debtor seeks to avoid that result.

---

1. W.T. Hutchinson, et al., *The Papers of James Madison*, vol. 14, p. 266, Chicago and Charlottesville, Virginia (1962–1991). Madison also wrote that "as a man is said to have a right to his property, he may equally be said to have a property in his rights." *Id.*

2. For example, according to the National Indian Gaming Commission, in 1997 Indian gaming revenues totaled about $7.4 billion. They have increased steadily, and in 2001 tribal gaming revenues totaled $12.7 billion, an increase of almost 16% from the previous year. These revenues were based on reports from 290 tribal gaming operations nationwide. According to the Wisconsin Department of Administration, there are presently 11 Indian tribes which have "gaming compacts" with the state.

The facts are themselves relatively straightforward. As indicated above, the debtor is an "enrolled member" of the Ho–Chunk Nation, a Wisconsin Indian tribe. The Nation operates casinos and other gaming operations on tribal lands. Part of the revenues generated by the gaming operations are used to fund so-called "per capita" distributions to the members of the tribe. These distributions are made on a quarterly basis by the tribe to all eligible tribal members. According to the briefs, in the past Mrs. Kedrowski has received approximately $2,000.00 per distribution, for an annual payment of about $8,000.00.

Initially, Mrs. Kedrowski claimed these payments as "income" on her bankruptcy schedules (Schedule I reflected anticipated monthly income of $666.67 per month from "Per Capita Distribution"). Subsequently, the debtors amended their schedules and claimed the per capita distribution as exempt to the extent available to them under the "wild card" exemption of 11 U.S.C. § 522(d)(5). This amount totaled $14,673.00. The bankruptcy trustee then filed a motion requesting that future per capita distribution payments· be turned over to him. The matter has been briefed and is ready for determination.

Upon initial review, it appeared that principles of tribal sovereignty, together with the notion that these payments were for the "welfare" of tribal members, might dictate that these funds should be excluded from the debtor's bankruptcy estate. However, a thorough review of federal and tribal law actually leads to a contrary conclusion. As the Court considered the issue, it became necessary to step back from the facts of this individual case and "begin at the beginning." Tribal gaming has a somewhat tortured past, and as a result it features an uneasy mixture of federal, state, and tribal rights and responsibilities. During the 1970s and early 1980s, there was an ongoing debate over the ability of state governments to control or constrain on-reservation tribal activities. This dispute culminated in the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), in which the Court held that the state's attempts to regulate the tribe's bingo business would impermissibly infringe upon the tribe's sovereign immunity.

Within a year of the *Cabazon* decision, Congress enacted the Indian Gaming Regulatory Act ("IGRA"). While it supports the notion that tribal gaming is "a means of promoting tribal economic development," it also created a legislative structure that restricted the scope of tribal sovereignty in a number of respects. *See* 25 U.S.C § 2702(1) (setting forth the congressional declaration of policy regarding the IGRA). In fact, many tribes opposed the passage of the Act because certain provisions gave the states considerable influence over gaming on Indian lands. *See generally* Eric Henderson, *Ancestry and Casino Dollars in the Formation of Tribal Identity*, 4 Race & Ethnic Anc. L.J. 7, 11 (Spring 1998). Congress passed the Act despite these objections, and it now provides the basic framework for the tribes to negotiate and obtain "gaming compacts" with the states. In general, these compacts are what authorize and regulate tribal "casino-style" gambling.

The IGRA set up three general classifications of Indian gaming. Class I gaming is within the tribes' exclusive jurisdiction and consists of "social games" that award prizes of minimal value. *See* 25 U.S.C. § 2703(6). Class II gaming consists of bingo and certain card games. Jurisdiction over these games is primarily tribal, but must comply with the IGRA's mandates and the tribe must receive approval from the National Indian Gaming Commis-

sion. *See* 25 U.S.C. § 2703(7). Finally, Class III games consist of "all forms of gaming that are not class I gaming or class II gaming." *See* 25 U.S.C. § 2703(8). Class III gaming is generally equated with casino gaming, and in order to engage in such operations a tribe must negotiate a compact with the state in which the tribe is located. The Secretary of the Interior has authority to approve the compact and may, under certain circumstances, reject it. *See* 25 U.S.C. § 2710(d)(8).

In 1992, the Ho–Chunk Nation (then known as the Wisconsin Winnebago Tribe) negotiated a gaming compact with the state of Wisconsin. The compact was originally intended to last for seven years, but was amended in 1998 to extend the term from June 11, 1999, to June 11, 2004. Under the compact, the tribe was granted the right to operate a variety of Class III games, including "electronic games of chance with video facsimile displays," blackjack, and "pull-tabs or break-open tickets." The compact made specific provisions for the conduct of the games. For example, no one under the age of 18 may play, no one who is "visibly intoxicated" shall be permitted to play, and the games shall be conducted on a "cash basis."[3]

In order for a tribe to obtain authorization for Class III casino gaming, the tribe must not only negotiate a gaming compact with the state but it must also adopt an "ordinance or resolution" that includes certain provisions regarding the disposition of gaming revenues. *See* 25 U.S.C. § 2710(b)(1)(B) (an Indian tribe may engage in gaming if "the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the Chairman"). The ordinance must contain certain provisions in order to be approved. Most important for the present inquiry, the IGRA specifies that the ordinance must provide that the net revenues from Class II or Class III gaming will only be used for the following purposes:

1. to fund tribal government operations or programs;

2. to provide for the general welfare of the Indian tribe and its members;

3. to promote tribal economic development;

4. to donate to charitable organizations; or

5. to help fund operations of local government agencies.

*See* 25 U.S.C. § 2710(b)(2).[4] If a tribal "ordinance or resolution" explicitly contains these provisions, it "shall" be approved by the gaming commission. *Id.*[5]

---

**3.** The 1992 compact between Wisconsin and the Ho–Chunk Nation is a 42–page document that contains very detailed provisions regarding the tribe's gaming operations. Given the explicit regulatory components of the compact, it is understandable why the tribes initially opposed the IGRA as it affords the states a considerable degree of control over how tribal gaming is actually conducted.

**4.** While this provision appears to be limited to "Class II gaming," the provisions regarding Class III gaming specifically provide that the same language is applicable to those revenues as well. Under 25 U.S.C. § 2710(d)(2), the Act provides that:

> If any Indian tribe proposes to engage in, or to authorize any person or entity to en-

gage in, a class III gaming activity on Indian lands of the Indian tribe, the governing body of the Indian tribe shall adopt and submit to the Chairman an ordinance or resolution that meets the requirements of subsection (b) of this section.

Thus, any tribal Class III gaming is subject to the provisions of § 2710(b) regarding the disposition of net gaming revenues.

**5.** Other requirements of the § 2710(b)(2) ordinance, such as tribal responsibility for the gaming activities or the commitment to outside auditors, are not critical to the outcome of this case. However, it is clear that an ordinance containing all of these provisions, including the restrictions on the disposition of

In connection with its gaming compact, the Ho–Chunk Nation created an ordinance as required by § 2710(b)(1)(B). The Ho–Chunk Amended and Restated Per Capita Distribution Ordinance provides for specific allocation of tribal gaming revenues. For example, the ordinance allocates 20.62% of tribal gaming revenues for "tribal government operations and programs," while another 68.94% of the funds are to "provide for the general welfare of the Nation or its members," 9.94% is to go to "promote tribal economic development," 0.30% is intended for "charitable donations," and 0.20% is to fund "local government services."

The IGRA permits, but does not require, the tribes to make per capita distributions to tribal members. If the tribe chooses to make per capita distributions, however, the ordinance must satisfy certain additional conditions regarding the authorization of the payments. *See* 25 U.S.C. § 2710(b)(3)(A) (net revenues may be used to make per capita payments to members of the Indian tribe only if "the Indian tribe has prepared a plan to allocate revenues"); 25 C.F.R. § 290.8 (tribes do not have to make per capita payments); 25 C.F.R. § 290.10 (tribe is in violation of IGRA if it makes per capita distribution without an approved tribal revenue allocation plan); 25 C.F.R. § 290.13 (per capita distributions may be made only after a tribal revenue allocation plan is approved). The Ho–Chunk Nation has chosen to make per capita distributions to tribal members, and Section 1.01 of the tribal ordinance specifically states that it "is intended to provide for fair and equitable per capita distribution to duly enrolled tribal members of revenues . . . from gaming activities."

The ordinance does give the tribe a measure of latitude regarding the per capita distributions. Distributions are supposed to be made "quarterly on the first day of the months of November, February, May, and August." *See* Section 7.01 of the ordinance. Under Section 3.01 of the ordinance, the tribal legislature is to "review the income, expenses and management" of the gaming operations prior to the distribution dates in order to determine whether it is necessary to make changes to the revenue allocation plan. At that time, the legislature shall "determine what amount, if any, of the revenues allocated to general welfare purposes shall be appropriated for distribution as per capita payments." Thus, it is clear that the tribe is able to adjust the amount of any distributions based upon available resources and other considerations that might lead the legislature to conclude that it is necessary to modify or suspend the payments.[6] In the event payments are made, they are sent to all eligible members. Any such payments are specifically subject to federal income tax.[7]

Of significance, however, is the fact that there does not appear to be any authority for the tribe to restrict or prohibit the distribution to a particular tribal member. The IGRA does require that the tribe's allocation plan protect and preserve "the

gaming revenues, is a prerequisite to the approval of a tribe's gaming activities.

6. However, Section 3.01 does provide that "[a]n affirmative vote of at least a majority of the members of the Ho–Chunk Nation Legislature shall be required to approve any changes to the Revenue Allocation Plan or to authorize per capita appropriations."

7. *See* Section 8.01 of the Ordinance, which provides that the payments are subject to income tax, and that members are responsible for all applicable taxes. *See also* 25 U.S.C. § 2710(b)(3)(D), which requires that per capita payments be subject to federal taxation.

interests of minors and other legally incompetent persons who are entitled to receive any of the per capita payments." *See* 25 U.S.C. § 2710(b)(3)(C). The Ho–Chunk Nation's ordinance contains provisions regarding minor children and "legally incompetent" adult members of the tribe.[8] Other than providing for minors and incompetents, however, section 5.01 of the ordinance is quite clear:

*All members of the Ho–Chunk Nation* that are on the tribal rolls shall be eligible to receive per capita distributions. Such distribution shall be made in an equal amount of money to each tribal member eligible to receive a per capita distribution pursuant to this Ordinance (emphasis added).

The tribal ordinance and the applicable federal regulations are quite specific when it comes to determining "tribal membership." A member is defined in Section 2.01 of the ordinance as "those living individuals on the date set forth for per capita distribution . . . who are duly recognized as members of the Ho–Chunk Nation."[9] Under Section 5.01, membership shall be determined in accordance with the Tribal Enrollment and Membership Act, and there are specific provisions regarding the appeal rights from an adverse determination.[10] The ordinance does not authorize or permit the tribe to refuse a per capita distribution to someone for any reason other than an "adverse determination" regarding tribal membership. Even minors and legal incompetents are entitled to their payments; the payments are simply made to a trust instead of to the individual. In fact, the narrow definition of "legal incompetent" highlights the fact that the per capita distributions are intended to be exactly that—namely, payments to each tribal member, regardless of individual circumstance.[11]

8. Under Section 6.01 of the ordinance, the per capita payments for minor children and legally incompetent adults are paid to a "Children's Trust Fund," and the money is held "under the supervision of the Trial Court of the Nation."

9. The federal regulations provide that "member of an Indian tribe" means an individual who meets the requirements established by applicable tribal law for enrollment in the tribe and (i) is listed on the tribal rolls of that tribe if such rolls are kept or (ii) is recognized as a member by the tribal governing body if tribal rolls are not kept. 25 C.F.R. § 290.2.

10. The Constitution of the Ho–Chunk Nation provides that the following persons are eligible for membership, provided they are not enrolled members of any other Indian nation:

(a) All persons of Ho–Chunk blood whose names appear or are entitled to appear on the official census roll prepared pursuant to the Act of January 18, 1881 (21 Stat. 315), or the Wisconsin Winnebago Annuity Payroll for the year one thousand nine hundred and one (1901), or the Act of January 20, 1910 (36 Stat.

873), or the Act of July 1, 1912 (37 Stat. 187); or

(b) All descendants of persons listed in Section 1(a), provided, that such persons are at least one-fourth (1/4) Ho–Chunk blood.

Article II, Sec. 1 of the Constitution of the Ho–Chunk Nation. Under Section 5 of the Constitution, the Ho–Chunk Legislature "shall have the power to enact laws not inconsistent with this Article to govern membership." The Tribal Enrollment and Membership Act of 1995 establishes procedures for applying for tribal membership, computation of the "percentage of Ho–Chunk blood," and other related matters.

11. The term "legal incompetent" is defined as "an individual who is eligible to participate in a per capita payment and who has been declared to be under *a legal disability,* other than being a minor, by a court of competent jurisdiction, including tribal justice systems or as established by the tribe" (emphasis added). *See* 25 C.F.R. § 290.2. The typical definition of "disability" includes "the inability to perform some function; an objectively measurable condition of impairment, physical or mental" and "incapacity in the eyes of the

■ With this background firmly in mind, it is possible to consider the specific question now before the Court. The issue is whether the debtor's "right" to receive this per capita distribution is property of the bankruptcy estate. As is always necessary in such cases, the Court's inquiry must begin with the definition of "property of the estate." Under 11 U.S.C. § 541(a), the commencement of a bankruptcy case creates an estate that is comprised of "all legal or equitable interests of the debtor in property." The scope of this provision is broad and all encompassing. *See Chappel v. Proctor (In re Chappel)*, 189 B.R. 489 (9th Cir. BAP 1995); *In re Brunswick Hosp. Ctr., Inc.*, 156 B.R. 896 (E.D.N.Y. 1993); *In re Miller*, 16 B.R. 790, 791 (Bankr.D.Md.1982). The intent of this provision is to include all property rights of the debtor, even if that property right is contingent. *Movitz v. Palmer (In re Palmer)*, 167 B.R. 579 (Bankr.D.Ariz. 1994). The existence and scope of the debtor's interest in property is determined by reference to state law. *Miner v. Bay Bank & Trust Co. (In re Miner)*, 185 B.R. 362 (N.D.Fla.1995); *In re Bridgepoint Nurseries, Inc.*, 190 B.R. 215 (Bankr. D.N.J.1996).

■ Under Wisconsin law, tangible property is "that which may be felt or touched and is necessarily corporeal," while intangible property is "such property as has no intrinsic and marketable value, but is merely the representative or evidence of value." *Grochowski v. Larson (In re Estate of Larson)*, 196 Wis.2d 231, 235, 538 N.W.2d 802 (Wis.Ct.App.1995). Under the Uniform Commercial Code, "general intangible" is defined as:

> [A]ny personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas or other minerals before extraction. The term includes payment intangibles and software.

*See* Wis. Stat. § 409.102(1)(kg) (definition of "general intangible"). A partner's right to a distribution from a partnership has been held to be a "general intangible." *Sampson Invs. v. Sampson*, 111 F.Supp.2d 1064 (E.D.Wis.2000). Similarly, the right to receive payments under a federally-enacted dairy termination program constituted a "general intangible." *In re Weyland*, 63 B.R. 854 (Bankr.E.D.Wis.1986). Under these authorities, it is clear that in Wisconsin a person may hold an extensive variety of property rights, either tangible or intangible.

■ The debtor, however, argues that the per capita distributions are not "property." In her opening brief, she contends that "[m]embers of the Ho Chunk nation do not have a right or entitlement to gaming distributions." *See* Debtor's Brief in Opposition to Trustee's Motion for Turnover of Assets at p. 5. She submits that the distributions are the function of "tribal policy and good economic times." She cites the case of *Maxam v. Lower Sioux Indian Cmty. of Minnesota, d/b/a Jackpot Junction Casino*, 829 F.Supp. 277 (D.Minn.1993), in support of this proposition. In that case, the court stated that:

> The casino business is a risky enterprise. Like other entertainment industries, the success and profitability of casinos depends heavily on the disposable income of potential customers, which varies with the cycles of the economy.

*Id.* at 283. However, the *Maxam* case involved a request for a preliminary injunction while the tribe's distribution ordi-

law." Black's Law Dictionary 474 (7th ed.1999).

nance was under judicial review. Nothing in that case considered whether the per capita distributions were themselves a "property right." As a result, it is unclear what direct authority *Maxam* may offer in resolving the dispute.[12]

It must be recognized that various circumstances beyond the debtor's control, such as her death, the enrollment of additional tribal members, or a change in Wisconsin's policies toward gambling, could affect her ability to receive distributions. The Ho–Chunk Nation's per capita distribution ordinance itself reflects that the tribal legislature should give "due consideration" to the overall needs of the Nation and its members when determining what amount, "if any," of the tribe's general welfare allocation should fund per capita distributions. *See* Section 3.01 of the ordinance. And as was indicated previously, the tribe is not obligated to make per capita distributions. *See* 25 U.S.C. § 2710(b)(3); 25 C.F.R. § 290.8. Nonetheless, the fact remains that if distributions are made, they must be made equally to all members. Under Section 5.01 of the ordinance, *all members* of the tribe "shall" be eligible to receive per capita distributions. Under the applicable federal regulations, the phrase per capita distribution is defined as "the distribution of money or other thing of value to *all* members of the tribe, or to identified groups of members, which is paid directly from the net revenues of any tribal gaming activity" (emphasis added). 25 C.F.R. § 290.2. The 1992 guidelines issued by the Secretary of the Interior regarding review of per capita distribution ordinances state as follows:

> When the Revenue Allocation Plan calls for distribution of per capita payments to an identified group of members rather than all members, the tribe shall provide a justification for limiting such payments to the identified group of members. The justification must establish a rational basis for making payments to the identified group of members. The tribe must insure that the distinction between members eligible to receive payments and members ineligible is reasonable and not arbitrary, does not discriminate or otherwise violate the Indian Civil Rights Act. The tribe's justification must comply with the tribe's governing or organic documents.

*Guidelines to Govern the Review and Approval of Per Capita Distribution Plans* at 2 (U.S. Dept. of the Interior, Dec. 21, 1992).

It is undisputed that the debtor is an enrolled member of the Ho–Chunk Nation. Thus, if the tribe does decide to make a distribution, the debtor has a "right" to receive her share. Nothing in the IGRA, the federal regulations, or the Ho–Chunk per capita distribution ordinance would permit the tribe to exclude her from the distribution process. The debtor suggests that her "financial problems" might justify a determination by the tribe that she was not competent to handle her own affairs and that her distributions should be paid into a "spendthrift trust." There is no

---

**12.** In both *Maxam* and *Ross v. Flandreau Santee Sioux Tribe,* 809 F.Supp. 738 (D.S.D. 1992), the courts concluded that the IGRA abrogated tribal sovereign immunity and permitted federal courts to hear tribal membership disputes. For example, in *Maxam* the court stated that "[b]y engaging in gaming regulated by the IGRA, the [tribe] has waived its immunity to suits seeking to enforce the requirements of the statute." 829 F.Supp. at 285. This proposition has been questioned or rejected in a number of other cases. *See Florida v. Seminole Tribe,* 181 F.3d 1237 (11th Cir.1999); *Davids v. Coyhis,* 869 F.Supp. 1401 (E.D.Wis.1994). This Court is not obligated to consider the issue in the context of the present dispute.

statutory support for the notion that her financial problems could ever result in a determination that she is "legally incompetent" within the meaning of the IGRA. In fact, under the applicable federal regulations, "legally incompetent" simply means someone who has been declared to be operating "under a legal disability." 25 C.F.R. § 290.2. Further, the debtor has offered no support for her contention that financial distress constitutes "an objectively measurable condition of impairment." [13]

The debtor suggests that the per capita interest constitutes a "license," and as such is not assignable and does not rise to the level of a "property interest." She contrasts the per capita distribution to the case of *In re Liebman,* 208 B.R. 38 (Bankr. N.D.Ill.1997). In that case, the court held that the debtor's right to renew season tickets to Chicago Bulls games (at a point in time when such season tickets were quite valuable) was not "property of the estate." The debtor cites Wisconsin law for the proposition that when a person is granted the use of property without consideration, it is deemed a license. *See Rehse v. Indus. Comm'n,* 1 Wis.2d 621, 85 N.W.2d 378 (Wis.1957). She points to such things as the right to practice law, to sell alcohol, or to convey electrical power, all of which are transferable only upon the consent of the grantor. *See Wisconsin Pub. Serv. Corp. v. Marathon County,* 75 Wis.2d 442, 249 N.W.2d 543 (Wis.1977).

However, there is no "license" granted in this situation. If the tribe chooses to distribute gaming revenues to tribal members, there are guidelines that must be met on both the federal and tribal levels. Economic circumstances or other considerations might cause the tribal legislature to decide not to issue a per capita distribution. Nonetheless, the Court must conclude that the debtor has a "right" to

receive distributions if they are in fact made. This is not, as the debtor suggests, akin to "grandmother's birthday card." Grandmother can pick and choose and play favorites. The tribe cannot. The Ho–Chunk Nation operates a series of successful casinos. It is true that the casino business is a "risky enterprise." *See Maxam,* 829 F.Supp. at 283. However, it is a *business*—in fact, as the *Maxam* court noted, tribal gaming operations are "[l]ike other entertainment industries." *Id.* As such, tribal per capita distributions are far more conceptually akin to an interest in a business enterprise than they are a gift, a license, or some form of public assistance.

Someone who owns stock in a company, or holds a limited partnership interest in a business, may never receive a distribution on that interest. The business may encounter a poor economic climate, may find expenses outpacing revenues, and may even fail. But should the company ever issue a dividend, all stockholders receive an appropriate amount in relation to their interest. Clearly, those who hold a "right" to receive payment from the operation of a business hold some sort of intangible property right under Wisconsin law. *See Larson,* 196 Wis.2d at 235, 538 N.W.2d 802 (intangible property is "such property as has no intrinsic and marketable value, but is merely the representative or evidence of value"); *Sampson,* 111 F.Supp.2d at 1065 (partner's right to receive distribution from partnership constituted a "general intangible" under Wisconsin law).

It is true that these payments are made from funds which are designated for the "general welfare" of the tribe. Nonetheless, they are not associated with social welfare programs and are generally treated as "income." As indicated previously, the per capita distributions are specifically

---

**13.** *See* footnote 11, *infra,* for the definition of "disability" and "legal incompetent."

subject to federal income tax. A recent I.R.S. publication offering guidelines on "Gaming Tax Law" for Indian tribes provides as follows:

> Per capita payments do not include payments authorized by a tribe for special purposes or programs, such as social welfare, medical assistance, or education. Even though a tribal member may receive payments from net revenue for social welfare, medical assistance, or education, a tribe's designation of these payments is not determinative of their tax status.

> Certain "need"-based payments are not taxable. Although there is no express statutory exclusion for a welfare benefit, government disbursements promoting the general welfare of a tribe are not taxable. Grants received under social welfare programs that did not require recipients to establish *individual need* have not qualified for tax-exempt status.

*Gaming Tax Law for Indian Tribal Governments* at 15–16 (Internal Revenue Service), Publication No. 3908 (5–2002).

In addition, per capita payments have been included when calculating a tribal member's "income" for a variety of purposes. In *Stevens v. Dir. of Dep't of Soc. Servs.*, 226 Mich.App. 61, 572 N.W.2d 41 (Mich.Ct.App.1997), the court concluded that a tribal member's per capita distribution could be considered in determining the member's eligibility for aid to families with dependent children (ADC) benefits. The court stated that "there is no federal statute specifically authorizing the exclusion of tribal gaming revenues from consideration as income." *Id.* at 63, 572

N.W.2d 41. Similarly, in *Seymour v. Hunter*, 603 N.W.2d 625 (Iowa 1999), the Supreme Court of Iowa ruled that the per capita payments to a tribal member could be used to calculate his "income" for child support purposes despite his contention that the payments were "unguaranteed, speculative, and left totally to the whim of the tribal council." The court stated that income "need not be guaranteed" to be considered in the support determination. *Id.* at 626.

Even the Ho–Chunk Nation itself recognizes that its members have a certain "right" to the per capita distributions which raise them above the level of a license or a gift. In the case of *Hendrickson v. HCN Enrollment*, CV 99–10 (Ho–Chunk Nation Trial Court 1999), the plaintiff contested the revocation of her membership in the tribe, which had taken place in accordance with the Ho–Chunk Nation's Ineligible Tribal Member Removal Procedures ("ITMRP").[14] She had been removed from the tribal rolls during a distribution period and contended that the tribe violated her constitutional rights by withholding that per capita distribution from her. The court reviewed the per capita distribution ordinance and the Ho–Chunk Nation's Constitution and concluded "the right to per capita exists so long as a member is on the rolls of the Ho–Chunk Nation." *Hendrickson*, slip opinion at sec. III (Constitutionality of § 2.01 and § 2.02 of the ITMRP). More importantly, the court stated:

> The right to receive per capita as an equal fraction of the tribe's gaming revenues all members receive constitutes a

---

**14.** This procedure is another aspect of the Ho–Chunk Legislature's power under the tribal constitution to enact laws "to govern membership." The Ineligible Tribal Member Removal Procedures outlines the process by which the affected member is notified of the dispute over membership. The tribal member is afforded a hearing, and the administrative decision may be appealed to the Tribal Court. *See* Section 2 of the Ineligible Tribal Member Removal Procedures.

right to share equally in money. *Money is a type of property* (emphasis added). *Id.* The tribal court recognized that the per capita distribution remains the property of the tribe until the distribution is "declared" in conformity with the tribe's per capita ordinance. The court stated that "per capita does not become property of each tribal member unless and until it is declared, since the amount may vary from quarter to quarter." *Id.* Nonetheless, the court concluded the plaintiff's rights had in fact been violated since the tribe had refused to issue her per capita distribution even though she remained on the tribal rolls at the time her membership was initially contested; her "absolute right" to receive per capita continued until the time that the Office of Enrollment had provided her with both notice of withholding and a hearing. *Id.*

Finally, the only other court that appears to have decided this particular issue ruled in favor of the bankruptcy trustee. In *Johnson v. Cottonport Bank,* 259 B.R. 125 (W.D.La.2000), the court was confronted with both a creditor who wished to continue collecting a loan secured by the debtor's per capita distribution and a bankruptcy trustee who sought turnover of any additional payments. The court stated that the debtor had not demonstrated "any exemption or exclusion available under state or federal law [that] prevents the per capita payments from treatment as property of the estate." *Id.* at 131. The *Johnson* court acknowledged that the right to per capita distributions cannot be devised to someone else because they last only for the life of the tribal member. Nonetheless, the court concluded that "[t]his characteristic does not prevent the payments or the right to receive them from being recognized as property." *Id.* This court agrees that the fact that this "right" has no "intrinsic or marketable value" is not determinative. The debtor's

"right" to receive distributions from the tribe's gaming operations is "representative" of value and constitutes a "property right" within the meaning of 11 U.S.C. § 541(a).

■ The debtor argues that even if her entitlement to the per capita distribution is "property," it should be excluded from the bankruptcy estate under the terms of 11 U.S.C. § 541(c). Section 541(c)(2) provides that "a restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a case under this title." Essentially, this means that "spendthrift trusts" and other such interests are excluded from the bankruptcy estate. In *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), the Supreme Court ruled that the restrictions on the alienation of pension plan funds found in ERISA meant that a debtor's interest in such a plan was excluded from the bankruptcy estate. The debtor suggests that the per capita distribution is subject to a similar restriction on alienation. She cites 25 U.S.C. § 117b(a) and suggests that it operates much like the provisions of ERISA at issue in *Patterson.* Section 117b(a) provides:

> Funds distributed under sections 117a to 117c of this title shall not be liable for the payment of previously contracted obligations except as may be provided by the governing body of the tribe and distributions of such funds shall be subject to section 7 of the Act of October 19, 1973 (87 Stat. 466), as amended [25 U.S.C.A. § 1407].

While initially this suggests that the debtor's interest in the per capita distributions might be excluded from the bankruptcy estate, a careful review of the applicable law reveals that § 117b(a) does not apply to tribal gaming revenues at all.

Under 25 U.S.C. § 117a, the "funds" in question are those "which are held in trust by the Secretary of the Interior ... for an Indian tribe." Indian gaming revenues are not "trust funds." They do not appear on the Bureau of Indian Affairs' list of possible trust fund sources (the list includes such things as payments from the United States government, money derived from the sale of tribal land, penalties for trespass on tribal land, and the like). Tribal gaming revenues never even reach the federal coffers. In fact, the Code of Federal Regulations explicitly provides that the Secretary of the Interior "will not accept *any* deposits of payments or funds derived from net gaming revenues to any account held by BIA or OTFM" (emphasis added). *See* 25 C.F.R. § 290.16.

Despite the debtor's reference to the "paternalistic" stance of the federal government toward the Indian tribes, the reality is that in the context of gaming revenues, the federal government has provided the tribes themselves with significant latitude. The tribes are authorized to negotiate gaming compacts with the individual states. They are permitted to establish revenue allocation plans, and those plans may authorize per capita distributions among the tribal members. Their gaming revenues are never deposited into any federal account, and the government actually refuses to accept them. Quite simply, the federal government does not regard those revenues as "trust funds." Therefore, as the per capita distributions are not "trust funds," they are not subject to the anti-alienation provisions of 25 U.S.C. § 117b(a), and that section does not qualify as "applicable nonbankruptcy law" under § 541(c)(2).[15]

Another possible "anti-alienation" provision is the Ho–Chunk Nation's own Claims Against Per Capita Ordinance. Under Section 102 of this ordinance, which was enacted in September of 1996, the Ho–Chunk Legislature provided that per capita distributions:

> [S]hall retain their character as property of the Nation until Payment of Per Capita Shares is actually made therefrom. No Tribal Member, nor any person claiming any right derived from a Tribal Member, including creditors of a Tribal Member, shall be entitled to compel the making of any Per Capita Distribution.

This section, however, does not seem to do much more than reiterate the fact that the Ho–Chunk Nation is not *obligated* to make per capita distributions. That same sentiment is reflected in the IGRA and the tribal per capita ordinance. Similarly, Section 102 also provides that:

> No tribal member, nor any person claiming any right derived from a Tribal Member, ... shall have any right, title, interest or entitlement in any Per Capita Share unless and until Payment of the Per Capita Distribution to which it relates occurs.

The only specific anti-alienation provision of the ordinance is found in Section 104, which states:

> [T]he Nation shall not recognize or enforce any claim, garnishment, levy, attachment, assignment or other right or interest in a Per Capita Share. The Nation shall pay the full amount of the Per Capita Share, less any claim recognized under Section 103, to the Tribal Member whose interest in the Per Cap-

---

15. Of course, this decision does not address whether § 117(b)(a) would constitute "applicable nonbankruptcy law" in the context of

payments which were "trust funds" within the meaning of the statute.

ita Distribution is represented thereby at the time of Payment.[16]

This language, however, is instructive in what it does *not* say. For example, § 117b(a) specifically provides that certain tribal trust funds "shall not be liable for the payment of previously contracted obligations." · Most state spendthrift trust provisions contain similar protections. In Wisconsin, a trust instrument may provide spendthrift protection for beneficiaries. Wis. Stat. § 701.06(2) provides that "[t]he interest in principal of such a beneficiary cannot be assigned and is exempt from claims against the beneficiary." The tribal "claims against per capita" ordinance does not say that the per capita distributions "shall not be liable" for the tribal members' debts.

Rather, the ordinance merely reiterates that the tribe itself retains its sovereign status and does not consent to anything that might be considered a waiver of its sovereign immunity. In virtually every document, the tribe is careful to reassert its sovereign immunity.[17] There is nothing in the claims ordinance which suggests that the tribe could restrict payment based on the debtor's financial status. Here again, this "nonbankruptcy law" does not seem to contain any specific anti-alienation

provision that would trigger the application of § 541(c)(2). As there is no "applicable nonbankruptcy law" that restricts the transfer of the debtor's per capita distribution, it cannot be excluded from the debtor's bankruptcy estate.

Finally, the debtor suggests that the tribe's sovereign immunity somehow impacts the determination in this case. Between the debtor and the trustee, however, there is clearly no issue of sovereign immunity. The Indian tribes themselves enjoy immunity from suit, and individual tribal members who are acting as representatives of the tribe may similarly be immune from suit. *See Stringer v. Chrysler (In re Stringer)*, 252 B.R. 900 (Bankr. W.D.Pa.2000). However, a member of an Indian tribe is amenable to suit if the subject of the suit is not related to a tribal officer's performance of official duties. *Id.* at 901. In *Stringer,* for example, a chapter 11 debtor-in-possession sought to compel turnover of equipment which was being held by a customer. The mere fact that the customer was a member of an Indian tribe did not preclude the suit, given that there was no allegation the customer was acting in an official tribal capacity. *Id.*[18]

In conclusion, the Court finds that the debtor's "right" to receive a per capita

---

**16.** Section 103 of the ordinance provides that the Nation will "recognize and enforce" tribal debts, child support obligations, and federal income tax levies. The tribe claims it will refuse to recognize any other "interest" in the distributions.

**17.** For example, Article XII of the Ho–Chunk Nation Constitution provides that the tribe "shall be immune from suit except to the extent that the Legislature expressly waives its sovereign immunity." Section XXIV of the 1992 gaming compact provides that the tribe has not waived its sovereign immunity and "no provision of this Compact is intended to constitute a waiver."

**18.** The debtor may well be correct that the trustee cannot pursue an action against the tribe to compel payment of the per capita distribution. On the other hand, it appears that as long as the tribe makes per capita distributions, the debtor is entitled to receive her share. If the tribe refused to make a distribution to her (but did so to other tribal members in violation of the tribal ordinance and federal law), the tribe might be amenable to suit under the IGRA. *See Ross v. Flandreau Santee Sioux Tribe,* 809 F.Supp. 738 (D.S.D. 1992) and footnote 12, *infra.* Whether the trustee could in fact assert the debtor's rights under the tribal per capita ordinance or the IGRA is not an issue presently before this Court.

distribution from the gaming revenues of the Ho–Chunk Nation does constitute property of her bankruptcy estate. No provision of federal law, the gaming compact between the tribe and the state of Wisconsin, or the tribe's per capita distribution ordinance suggests a contrary result. In fact, when taken together, these sources compel the result reached by the Court. Quite simply, the debtor holds an "absolute right" to receive net revenues from the operation of a tribal business. The mere possibility that the tribe might not choose to make a distribution may mean that the debtor's right does not have any intrinsic or marketable value, but it does not alter the fact that it is "representative" of value.

Accordingly, the trustee's motion for turnover is granted. Any per capita distributions made to the debtor in excess of her claimed exemption amount of $14,673.00 shall be turned over to the bankruptcy trustee.