**In re Elena M. FESS, Debtor.**

**No. 06–11890.**

United States Bankruptcy Court,
W.D. Wisconsin.

May 4, 2009.

Victoria J. Hewelt Cazel, Madison, WI, for Debtor.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Bankruptcy Judge.

The chapter 7 trustee filed a motion for turnover on February 26, 2009. The debtor, Fess, objected on March 19, 2009. At a preliminary hearing on April 6, 2009, no facts were identified as disputed and the

parties were invited to brief the issues raised within 20 days. Neither party filed any additional briefing.

Fess is a member of the Ho–Chunk Nation. The Ho–Chunk Nation operates casinos on its reservation and has, in the past, used a portion of its gaming revenues to make per capita income distributions to members.[1] Fess has received per capita income distributions from the Ho–Chunk Nation in the past, typically in the amount of $3,000 per quarter.

A prior order of this Court, entered on the debtor's default, directed the Ho–Chunk Nation to turn over per capita income distributions otherwise intended for Fess to the chapter 7 trustee. The Ho–Chunk Nation refused to honor the order. By its current motion, the chapter 7 trustee has requested that all future per capita income distributions received by Fess be turned over to the bankruptcy estate.

■ The Bankruptcy Code provides that the bankruptcy estate is "comprised of all the following property, wherever located and by whomever held: (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (2009). In a case, such as this one, converted from chapter 13 to chapter 7, "property of the estate in the converted case shall consist of property of the estate as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on the date of conversion." *Id.* § 348(f)(1)(A). A debtor's interest in property is determined by applicable state law unless federal law provides otherwise. *See, e.g., Jones v. Atchison (In re Atchison),* 925 F.2d 209, 210

(7th Cir.1991) (citing *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). The Seventh Circuit has noted, in the context of a § 544(a)(1) lien avoidance proceeding, that

> in the mine-run case-for example one concerning a private creditor's interest in a tractor or some type of inventory-state law governs. But when the property in question falls outside of state commercial codes by virtue of *the federal interest or the nature of the property,* federal law provides the rule of decision.

*Airadigm Commc'ns, Inc. v. Federal Commc'ns Comm'n (In re Airadigm Commc'ns., Inc.),* 519 F.3d 640, 650 (7th Cir.2008) (emphasis supplied). The circuit court further opined that "if a federal statute speaks to the issue directly, the court will look no further.... Barring that, courts can either adopt state law as the rule of decision, ... or craft a federal rule of common law." *Id.* (citations omitted). The circuit court went on to hold that the property in question—an FCC license—"is a creature of federal law. Accordingly, federal law also defines the FCC's retained interest in that license." *Id.* at 651.

In another case in this district involving per capita payments from the Ho–Chunk Nation to a chapter 7 debtor, Judge Crabb looked to tribal law to determine whether the chapter 7 trustee could avoid the interest of a tribal credit union in per capita payments. *See Ho–Cak Fed. v. Herrell (In re DeCora),* 396 B.R. 222 (W.D.Wis. 2008). In *DeCora,* the issue was whether a hypothetical lien creditor "would have had rights in the per capita payments superior to Ho–Cak ... under applicable non-bankruptcy law." *Id.* at 224. The Court held that "[i]n assessing the rights of the hypothetical lien creditor, 'applicable non-bank-

---

1. For an extensive foray into the history of the Ho–Chunk Nation's gaming operations and per capita income distributions ordinance, *see*

*In re Kedrowski,* 284 B.R. 439 (Bankr. W.D.Wis.2002).

ruptcy law' potentially includes not only state commercial codes, but also federal law, . . . and in this case, tribal law." *Id.* at 224–25 (citation omitted). The Court then analyzed the portion of the Ho Chunk Nation's Code relating to per capita payments and found that "tribal law subordinates the lien creditor's claim to Ho–Cak's and federal preemption and tribal sovereignty prevent state law from altering this result." *Id.* at 225. This was true because the Ho–Chunk Nation's Code "does not legally recognize a judgment lien against per capita rights." *Id.* In addition:

> The Ho–Chunk Nation's sovereignty and the federal interest in tribal self-governance would preempt any attempt by the lien creditor to rely on Wisconsin courts and state law to impose a different result. . . . The tribal interest in regulating distribution of tribal assets to tribal members is a type of internal regulation within tribal sovereignty upon which state law is usually not permitted to intrude. . . . HCC § 5 also implicates rights of non-Indian creditors, so assessing whether state law can alter tribal law requires balancing of the federal and tribal interests in tribal sovereignty and self-governance with state interest in enforcing its laws . . . . the Nation's interest in controlling the distribution of its revenue far outweighs Wisconsin's interest in enforcing its commercial code. The right of the Nation to distribute its own assets as it sees fit is central to self-governance; Wisconsin's interest in uniform treatment of creditors is minimal by comparison.

*Id.*

■ Federally recognized Indian tribes are sovereign nations subject only to the authority of the federal government. *See, e.g., California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). State laws, however, "may be applied to tribal Indians on their reservations if Congress has expressly so provided." *Id.* The Indian Gaming Regulatory Act permits states to regulate certain forms of Indian gaming, which are divided into three statutory classes. *See* 25 U.S.C. § 2701 et seq. Specifically, "class III" gaming must be "conducted in conformance with a Tribal–State compact entered into by the Indian Tribe and the State." *See id.* § 2710(d)(1). Class III gaming includes casino gaming because neither the definitions of class I nor class II gaming include casino gaming. *See id.* § 2703 (defining class III gaming as "all forms of gaming that are not class I gaming or class II gaming"). If the state and the tribe agree to a compact, the class III gaming activities

> shall be lawful on Indian lands only if such activities are—
> (A) authorized by an ordinance or resolution that—
> (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
> (ii) meets the requirements of subsection (b) of this section, and
> (iii) is approved by the Chairman [of the National Indian Gaming Commission].

*Id.* § 2710(d)(1). Subsection (b) of the statute requires the Chairman to approve any tribal ordinance provided that the ordinance meets certain requirements, *Id.* § 2710(b)(2). Among the requirements are that "net revenues from any tribal gaming are not to be used for purposes other than—. . . (ii) to provide for the general welfare of the Indian tribe and its members." *Id.* § 2710(b)(2)(B). Revenues from gaming activities "may be used to make per capita payments to members of the Indian tribe" if certain conditions are met. *Id.* § 2710(b)(3).

The Ho–Chunk Nation Code establishes a tribal member's right to a per capita

distribution from class III gaming revenues. Specifically, the Code allocates 78.26% of "Tribal Gaming Revenues" to "provide for the General Welfare of the Nation or its members." 2 HCC § 12, 6.a.(2). In addition, "the Legislature shall ... determine what amount, if any, of the revenues allocated to general welfare purposes shall be appropriated for distribution as per capita payments." *Id.* § 12, 5. The Code states that

> Per Capita Distributions shall be made, when and as determined or declared in accordance with Per Capita Distribution Ordinance and any and all other applicable laws of the Nation, out of assets and earnings of the Nation, and *such assets and earnings shall retain their character as property of the Nation until Payment of Per Capita Shares is actually made therefrom.*

*Id.* § 8, 4 (emphasis supplied). The Code further provides that:

> No Tribal Member, nor any person claiming any right derived from a Tribal Member, including creditors of a Tribal Member, shall be entitled to compel the making of any Per Capita Distribution prior to the time of Payment thereof, and making each Per Capita Distribution, *and the amount and timing thereof, shall at all times prior to Payment be subject to elimination or modification pursuant to any amendment to the then effective Per Capita Distribution Ordinance adopted in accordance with the Constitution and laws of the Nation.*

*Id.* (emphasis supplied). Finally, "[n]o Tribal Member, nor any person claiming any right derived from a Tribal Member, including creditors of a Tribal Member, *shall have any right, title, interest or entitlements in any Per Capita Share unless and until Payment of Per Capita Distribution to which it relates occurs" Id.* (emphasis supplied).

A handful of courts have considered whether per capita payments constitute property of the estate. *See, e.g., Johnson v. Cottonport Bank,* 259 B.R. 125 (W.D.La.2000); In re McDonald, 353 B.R. 287 (Bankr.D.Kan.2006); *In re Kedrowski,* 284 B.R. 439 (Bankr.W.D.Wis.2002). In *McDonald,* the debtors' case was converted from chapter 13 to chapter 7, and the chapter 7 trustee moved for turnover of all post-conversion per capita payments. *See* 353 B.R. at 288–89. The debtors conceded that the per capita payments were property of the estate, and the court agreed, citing *Kedrowski* and *Cottonport* as authority. *See id.* at 291 n. 14. The court rejected the debtors' contention that the payments were exempt pursuant to tribal law and that the payments were not property of the estate pursuant to § 541(c)(2). *See id.* at 292–94. The court then ordered the debtors to turn over "all future per capita distributions ... until all claims and expenses of this estate are paid, or further order of the Court." *Id.* at 295.

In *Kedrowski,* Judge Utschig, writing before *DeCora* and *Airadigm* had been decided, exhaustively analyzed the underlying federal, tribal, and state law and held that future per capita payments from the Ho–Chunk Nation to the chapter 7 debtor were property of the estate. *See* 284 B.R. at 451–52. In *Cottonport,* the court looked to Louisiana law and held that per capita payments were property of the bankruptcy estate. 259 B.R. at 130–31.

In this case, the chapter 7 trustee appears to be seeking future per capita payments only. In a case converted from chapter 13 to chapter 7 (such as this one), property of the estate encompasses only the debtor's interest in property on the date of the filing of the chapter 13 petition. Therefore, the relevant question is whether Fess's interest, if any, in the per capita payments at the time of the filing of the

chapter 13 petition constitutes property of the estate.

The determinative question appears to be whether this Court should apply state or federal law to determine Fess's property interest. Bankruptcy courts considering this issue, including a court from this district, have applied state law and concluded that a tribal member has a property interest in future per capita payments at the time of filing a petition. On the other hand, the Ho–Chunk Nation Code clearly provides that per capita payments are property of the tribe until they are *received* by the tribal member. That Code explicitly states that the tribal member has no right, title, interest, or entitlements to a per capita payment until the payment occurs. Therefore, if tribal law is considered to determine property interests, future per capita payments do not appear to be property of the estate.

Precedent in the 7th Circuit and this district indicate that tribal law rather than state law should be consulted on this particular point. *Airadigm* notes that state law does not govern the determination of a property interest when the property "falls outside of state commercial codes by virtue of the federal interest or the nature of the property." 519 F.3d at 650. Here, the per capita payments fall within both exceptions. First, as noted by Judge Crabb in *DeCora*, "the Nation's interest in controlling the distribution of its revenue far outweighs Wisconsin's interest in enforcing its commercial code. The right of the Nation to distribute its own assets as it sees fit is central to self-governance." 396 B.R. at 225. This suggests that a federal interest, namely the Ho–Chunk Nation's interest in creating and defining property interests in per capita distributions, outweighs Wisconsin's interest in uniformity of definition of property interests. In addition, federal law authorizes tribes to create these particular property rights. Although federal law does not itself create the property right (as it did in *Airadigm* ). it specifically authorizes tribes to create a certain type of property: per capita distributions. The per capita payments thus fit squarely within the exception discussed in *Airadigm.*

In addition, this case presents a situation not unlike the one encountered recently by this Court in *Holter v. Resop (In re Holter),* 401 B.R. 372 (Bankr.W.D.Wis. 2009). In *Holter,* the chapter 7 trustee argued that a payment on death ("POD") account beneficiary's expectancy interest in a POD account was property of the estate. *See id.* at 373. This Court rejected that argument and quoted another decision as follows:

> The Court can think of no factual or legal basis why the "contingent interest" as a beneficiary of a POD account should be included as property of the estate under § 541(a)(1), while a "contingent interest" as beneficiary of a will would be excluded. *In both cases, the debtor has absolutely no right or access to the property until the death of the owner, the name of the beneficiary can be changed at any time without recourse, and the owner of the property can spend the money in any manner he or she chooses, leaving nothing for the beneficiary at death.* If such "contingent interests" are to be included in § 541(a)(1), there is no need to include property obtained by will in § 541(a)(5). In fact, *including such an interest in § 541(a)(1) would expand on what is authorized under § 541(a)(5), because if the interest is property of the estate under § 541(a)(1), there is no limit on when the debtor's interest must vest.* The 180 day period that applies to property under § 541(a)(5) is not applicable to property that is brought into the estate under § 541(a)(1)—meaning

*a trustee could claim the interest of any debtor who, at the date of filing their petition, was a potential beneficiary under a POD account or a will, even if the debtor's rights to the property did not vest (if ever) until years later.*

*Id.* at 376 (quoting *In re Hall,* 394 B.R. 582, 596 (Bankr.D.Kan.2008) (emphasis supplied)). Similarly, in this case, adoption of the trustee's position apparently leads to the result authorized in *McDonald:* all future per capita distributions are turned over to the chapter 7 trustee until all claims and expenses of the estate are paid. As the debtors noted in all three cases that have previously reached this issue, they may never receive another per capita distribution. For example, the tribe simply might not authorize per capita payments in the future. Or the debtor might be dropped from the tribal rolls. In any event, the chapter 7 trustee's position appears to contemplate an open-ended right to claim future per capita distributions for an indefinite period of time. As this Court pointed out, "[w]hen the drafters of the Bankruptcy Code intended to include expectancies to which no legal rights attach (such as those of a person named in a will), they recognized the need to be specific and not rely on the general language of § 541(a)(1)." *Id.* Similarly here, Fess simply has an expectancy to which no legal rights attach. Section 541(a)(1) is simply not broad enough to encompass her interest.

■ It may still be argued that the preceding legal analysis is superfluous because the prior order for turnover precludes a determination that the per capita payments are not property of the estate. The law of the case doctrine prevents continued litigation of the same issue in the same case. *See, e.g., Barrett v. Baylor,* 457 F.2d 119, 123 (7th Cir.1972) ("The unreversed decision on a question of law or fact made during the course of litigation settles that question for all subsequent stages of the suit."); *In re Weis,* 92 B.R. 816, 818 n. 3 (Bankr.W.D.Wis.1988) ("[D]ecisions involving the law of the case doctrine demonstrate that its applicability is limited to relitigation of issues already decided at an earlier stage of the same proceeding."). The doctrine is "a rule of practice, based on sound policy that, when an issue is once litigated and decided, that should be the end of the matter." *Barrett,* 457 F.2d at 123. The doctrine "is not ... an immutable rule, but rather a way to foreclose continued appeals for reconsideration of prior rulings of law." *Id.* If the same judge handles a case at all stages of the proceedings, the doctrine does not prevent the judge "from reversing himself ... unless the time for reconsideration had expired." *Williams v. Comm'r,* 1 F.3d 502, 503 (7th Cir.1993) (citation omitted).

Fed. R. Bankr.P. 9024 incorporates Fed. R.Civ.P. 60(b). Fed.R.Civ.P. 60(b) reads:

(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms,

the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been re-

versed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

A motion under the first three clauses of Fed. R. Bankr.P. 9024 must be made within one year of the judgment or order. *See* Fed. R. Bankr.P. 9024(c)(1).

 In this case, the time for reconsideration has not expired, and the Court's first order was not appealed. Therefore, the Court may reverse its earlier decision regarding whether the per capita payments were property of the estate. The case law places emphasis on not revisiting a decision rendered after a matter was litigated. This question was not previously litigated in any meaningful sense. Instead, no one objected to the chapter 7 trustee's motion, and the order was entered without any consideration of the issues discussed above. Accordingly, the law of the case doctrine does not bar the Court from reconsidering whether the per capita payments are property of the estate.

Upon the foregoing, an order may be entered denying the chapter 7 trustee's motion for turnover.

### ORDER

The Court having reached the conclusions of law contained in the memorandum decision filed this date, it is hereby ORDERED that the chapter 7 trustee's motion for turnover is DENIED.