In re William Leroy MCDONALD and
Bonnie Kay McDonald, Debtors.

No. 02–42850.

United States Bankruptcy Court,
D. Kansas.

Oct. 5, 2006.

See also 2006 WL 2848654.

Lynn D. Lauver, Clinic, P.A., Topeka, KS, for Debtors.

### MEMORANDUM OPINION AND ORDER GRANTING TRUSTEE'S MOTION FOR TURNOVER

JANICE MILLER KARLIN,
Bankruptcy Judge.

This matter is before the Court on the Trustee's Motion for Turnover.[1] The Trustee seeks an order requiring Debtors

---

1. Doc. 86.

to turn over to the Chapter 7 Trustee for administration any and all per capita distributions, and the payment advices relative to those distributions, received subsequent to the Order of Conversion on November 14, 2005.[2] The parties have submitted stipulations of facts and briefs on this matter, and the Court is now ready to rule. This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334, and it is a core proceeding under 28 U.S.C. § 157(b)(2)(E).

## I. FINDINGS OF FACT

The Court makes the following findings of fact based upon the stipulations filed by the parties, including the documents attached to the stipulations.[3] The Prairie Band of Potawatomi Indians of Kansas Tribe (the "Tribe") owns a casino on its reservation located approximately 15 miles north of Topeka, Kansas. A portion of the net quarterly revenue realized by this casino is divided among the enrolled members of the tribe on a per capita basis.[4] Whether to make distributions to members of the Tribe, as well as the exact amount of any distributions, is in the discretion of the governing body of the Tribe. Once the Tribe makes a determination that a distribution will be made and decides the amount of the total distribution, each member of the Tribe is entitled to receive an equal distribution, as fixed by tribal ordinance. Members of the Tribe are not required to provide any services, or to exchange any property of value, to receive their per capita distributions.

Debtor, Bonnie McDonald, is an enrolled member of the Tribe and has received, and is likely to continue to receive, per capita distributions. According to the parties' Supplemental Stipulation,[5] Bonnie McDonald received the following per capita distributions during the period between conversion and the date of the stipulations: $825.00 received December 5, 2005, $789.00 received March 6, 2006, and $864.00 received June 14, 2006.[6] The latter payment was turned over to the Trustee, who continues to hold that amount pending this decision.

Debtor's interest in future per capita distributions was not held in joint tenancy or as a tenant by the entirety immediately prior to the filing of this case. Debtors continuously resided in Topeka, Kansas for at least 180 days prior to the filing of their bankruptcy petition. Their home is not located on the Potawatomi Reservation or otherwise within the geographical limits of the area subject to the jurisdiction of the Potawatomi Nation.

---

**2.** Pursuant to 11 U.S.C. § 348(f)(1)(A), the property of the estate in this converted case consists of the property of the estate, as of the date of filing of the petition, that remains in the possession of, or is under the control of, the debtor on the date of conversion. Therefore, unless the Debtors had, in their possession or under their control, distributions that were made prior to the date of conversion, the estate would not have a claim to that property.

**3.** Doc. 121.

**4.** The term "per capita" is defined as "[d]ivided equally among all individuals, [usually] in the same class." Black's Law Dictionary (8th Ed.2004). In the context of distributions from gaming revenues, the term means that all tribal members receive an equal share, without regard to any factor other than membership in the tribe. According to this Tribe's constitution, one must have at least 25% Prairie Band Potawatomi blood to be an enrolled member of the Prairie Band Potawatomi Tribe. *See* Prairie Band Potawatomi Nation Constitution, Article III, Section 1.

**5.** Doc. 132.

**6.** It appears likely that another distribution might well have been received in September, 2006 prior to the date of this decision.

## II. CONCLUSIONS OF LAW

The Trustee seeks turnover of Ms. McDonald's post-conversion per capita distributions, contending they are property of the estate and are not exempt. This issue is one of first impression in this District, but it an important one because of the increase in tribal gaming revenues in this state. As the Wisconsin Bankruptcy Court noted in *In re Kedrowski*,[7] tribal gaming revenue is steadily increasing nationwide, totaling $12.7 billion in 2001. This was an increase of almost 16% from the previous year.

The Court assumes that this issue has not been an important one in Kansas until fairly recently because Indian-owned casinos are a relatively new phenomenon in this state. In Kansas, the Kickapoo tribe opened the Golden Eagle Casino on May 18, 1996, the Prairie Band Potawatomi opened a temporary casino in October 1996 (opening its Harrah's-operated casino in January 1998), and the Sac and Fox Nation of Missouri opened its casino in February 1997.[8] The casino that is on Potawatomi Tribal land must now be making sufficient revenue to result in distributions to its members in amounts large enough to capture the attention of the bankruptcy trustees located in Kansas.[9]

The Trustee, as the moving party, bears the burden of proof in this turnover action and must at least establish a *prima facie* case.[10] After that, the burden of explaining, or going forward, shifts to Debtors, but the ultimate burden or risk of persuasion is upon the Trustee. In order to meet this burden, the Trustee must show by clear and convincing evidence that the property belongs to the estate.[11]

Debtors have raised only one defense to turnover. They claim the property is exempt,[12] and rely on 11 U.S.C.

7. 284 B.R. 439, 440 (Bankr.W.D.Wis.2002). This opinion thoroughly explains the genesis of Indian gaming, including an explanation of the Indian Gaming Regulatory Act, which permits, but does not require, tribes to make per capita distributions to tribal members. As the Wisconsin court notes, "[i]f the tribe chooses to make per capita distributions ..., the ordinance must satisfy certain additional conditions regarding the authorization of the payments." *See* 25 U.S.C. § 2710(b)(3)(A) (net revenues may be used to make per capita payments to members of the Indian tribe only if "the Indian tribe has prepared a plan to allocate revenues"); 25 C.F.R. § 290.8 (tribes do not have to make per capita payments); 25 C.F.R. § 290.10 (tribe is in violation of IGRA if it makes per capita distribution without an approved tribal revenue allocation plan); 25 C.F.R. § 290.13 (per capita distributions may be made only after a tribal revenue allocation plan is approved). *Id.* at 443.

8. *See* Topeka Capital Journal, January 21, 2001 http://cjonline.com/stories/012101/bus_casinoprofit.shtm.

9. Although the Court does not rely on this number for any purpose other than to give context to why this is an emerging issue in Kansas, the Court understands that tribes submit an annual audit to the National Indian Gaming Commission regarding gaming revenues, but that most of that information is not publicly available. One source estimated that the total gaming revenue at the three casinos located in Kansas in 1998 ranged from $85 million to $175 million. Harrah's (the casino from which the Tribe in this case receives revenue), located closest to Topeka, was supposedly in the lead with $50 million to $100 million; Golden Eagle followed with $25 million to $50 million; and Sac and Fox was third with $10 million to $25 million. Another source suggests $33 out of every $100 of gaming revenue received by the Prairie Band Potawatomi Nation is "net profit" that becomes available for tribal use, including payment of per capita distributions. *See* http://www.pbpindiantribe.com/flowchart.htm.

10. *Evans v. Robbins*, 897 F.2d 966, 968 (8th Cir.1990).

11. *Id.*

12. The Court recognizes that Debtors failed to list this property as exempt on Schedule C, as required by Fed. R. Bankr.P. 4003(a). Given

§§ 522(b)(1) and (3)(B), § 541(c)(2), and Potawatomi Code § 4–10–16, to support their position. They do not deny that the property in question is property of the estate, and the Court finds that it clearly is.[13] The other two reported cases that concern per capita distributions have also found those distributions to be property of the estate.[14]

### A. 11 U.S.C. §§ 522(b) and (b)(2)(B) do not support Debtors' position.

Although not specifically referenced in Debtors' brief, the parties' stipulations erroneously refer to 11 U.S.C. §§ 522(b)(1) and (3)(B), and Debtors appear to rely on those statutes, to support their position that they are not required to turn over the per capita distributions to the Trustee. This case was filed prior to the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and the referenced provisions (§§ 522(b)(1) and (b)(3)(B)), upon which Debtors rely, did not in exist in the Code prior to those

amendments. Those same provisions, with certain changes not applicable in this case, however, were contained in different subsections of 11 U.S.C. § 522;[15] the correct citations are to § 522(b) and (b)(2)(B), respectively. Because it is clear that Debtors intended to rely on the exemptions found in § 522(b) and (b)(2)(B) (2004), the Court will treat Debtors' position as if they were relying on the appropriate sections under the prior version of the Code.

Subsections (b) and (b)(2)(B) of § 522 combine to provide an exemption for property "in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or a joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law." In this case, Debtors have stipulated that "[t]he interest of Debtor Bonnie Kay McDonald immediately prior to commencement of the case [and] the interest of Debtor William McDonald (if any) immediately prior to the

---

the fact that Fed. Rule Bankr.P. 1009 generally gives Debtors the right to amend their schedules, including Schedule C, as a matter of course before the case is closed, however, to include additional exempt property absent a showing of bad faith or prejudice to the creditors, the Court will not deny the claimed exemptions on this basis. *See In re Hardy,* 234 B.R. 94 (Bankr.W.D.Mo.1999) (citing *Doan v. Hudgins (In re Doan),* 672 F.2d 831, 833 (11th Cir.1982)) (holding that "[a]bsent a showing of bad faith or prejudice to the creditors, a debtor may amend the list of property claimed as exempt 'as a matter of course at any time before the case is closed.' ").

**13.** *See In re Kedrowski,* 284 B.R. at 446 (noting that "if the tribe does decide to make a distribution, the debtor has a 'right' to receive her share. Nothing in the IGRA, the federal regulations, or the Ho–Chunk per capita distribution ordinance would permit the tribe to exclude her from the distribution process."). *See also United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 76

L.Ed.2d 515 (1983) (discussing the very broad scope of § 541(a)(1)) and *In re Moses,* 256 B.R. 641, 645 (10th Cir.BAP2000) (holding that the term "property of the estate" under § 541(a)(1) is defined, in relevant part, as "all legal or equitable interests of the debtor in property as of the commencement of the case.").

**14.** *In re Kedrowski,* 284 B.R. at 451–52 (holding that per capita distributions made to members of the Ho–Chunk Nation tribe that are derived from net gaming revenues of the tribal-owned casino are property of the bankruptcy estate) and *Johnson v. Cottonport Bank,* 259 B.R. 125, 131 (W.D.La.2000) (holding that per capita distributions made to members of the Tunica Biloxi Tribe of Louisiana that are derived from net gaming revenues of the tribal-owned casino are property of the bankruptcy estate).

**15.** All statutory references are thus to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (2004), unless otherwise specified.

commencement of the case in the distributions and the right to distributions was not held in joint tenancy or as a tenant by the entirety." Based on this stipulation, it is clear that §§ 522(b) and (2)(B) are completely inapplicable in this case.

### B. The per capita distributions are not exempt by operation of Potawatomi Code § 4–10–16.

Debtors also contend, again not directly by argument in their brief, but indirectly by the wording of the stipulations, that they are entitled to exempt the property as a result of Potawatomi Code § 4–10–16. That section of the Tribal Code provides that per capita distributions "shall be exempt, from garnishment, attachment, execution, sale, and other process for the payment of principal and interest, costs, and attorney fees *upon any judgment of the Tribal Court.*" (emphasis added).

■ The Court finds Debtors are not entitled to rely upon the exemptions contained in the Potawatomi Tribal Code. First, § 522(b) allows individual debtors to choose between exemptions found in § 522(d) or those exemptions available in the state in which the debtor is domiciled for the 730 days prior to the filing of the bankruptcy petition, unless, as is the case in Kansas, the state in which the debtor has been domiciled prohibits the election of the federal exemptions.[16] There is nothing

in the Bankruptcy Code that allows a debtor to claim the exemptions of another governmental entity, such as when the debtor is not domiciled within the boundaries of that entity's territory. Secondly, the parties' stipulations clearly show that Debtors are not domiciled within the Potawatomi Reservation, but instead live in Topeka, Kansas. Therefore, pursuant to § 522(b) and K.S.A. 60–2312, their exemptions are limited to those allowed under Kansas law.[17] Because Kansas law does not allow Debtors to claim the exemption found in the Potawatomi Tribal Code, Debtors cannot rely on that provision to exempt the per capita distributions.[18]

■ The Court also holds that even if Debtors were entitled to rely upon this exemption, which they clearly are not, it would be inapplicable under the facts of this case. The tribal code clearly states that the exemptions only apply to a "judgment of the Tribal Court." There is nothing in the record to indicate that Debtors have had any judgments entered against them by the Tribal Court. By its very terms, the exemption at issue is not generally applicable and would not apply under the facts of this case.

### C. The per capita distributions are not exempt under § 541(c)(2).

The commencement of a voluntary bankruptcy case automatically creates an

---

**16.** *See* K.S.A. 60–2312(a) (stating that no person may elect to claim the exemptions contained in the Bankruptcy Code).

**17.** This opinion should not be read to hold, or even suggest, that if Debtors' domicile was within the Potawatomi Reservation, that they would be entitled to claim the exemptions found within the Tribal Code. That issue is not before the Court, and thus the Court does not decide it.

**18.** In contrast, Kansas specifically allows debtors to claim the exemptions contained in 11 U.S.C. § 522(d)(10), which include pay-

ments for social security benefits, unemployment benefits, veterans' benefits, disability payments, as well as alimony, support and maintenance payments necessary for the support of the debtor and any dependent of the debtor. *See* K.S.A. 60–2312(b). The decision of Congress, or in this case the Kansas Legislature, to enumerate specific exclusions creates a presumption that cases not included in that list of exclusions are subject to the statute. *See Matter of Cash Currency Exchange, Inc.,* 762 F.2d 542, 552 (7th Cir.1985) (applying maxim *expressio unius est exclusio alterius* to provisions of the bankruptcy code).

estate. Section 541(a) broadly defines property of the estate to include "all the following property, wherever located and by whomever held: (1) ... all legal or equitable interests of the debtor in property as of the commencement of this case." Proceeds, product, offspring, rents or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after commencement of the case, are also property of the estate.[19]

■ Debtors contend that the per capita revenues are trust funds that are protected by a spendthrift provision, and that such trust funds are thus excludable from the bankruptcy estate under § 541(c)(2).[20] Section 541(c)(2) provides: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." Congress clearly intended to exclude from the estate those assets of "spendthrift trusts" traditionally beyond the reach of creditors under State trust law.[21] Spendthrift trusts have long been held to be valid under Kansas law.[22]

■ To exclude property from the bankruptcy estate under § 541(c)(2), Debtors must satisfy three criteria.[23] First, they must show that they have a beneficial interest in a trust. Second, they must show that there is a restriction on the transfer of that interest. Third, they must show that the restriction is enforceable under nonbankruptcy law.[24] The Court finds that the post-petition per capita distributions that Debtor, Bonnie Kay McDonald, is entitled to receive are not held in trust, and, therefore, § 541(c)(2) is not applicable.[25]

The per capita distributions to which Debtor is entitled are created and governed by the Per Capita Ordinance passed by the Tribe. That ordinance, which was

---

**19.** 11 U.S.C. § 541(a)(6). *Cf. Towers v. Wu (In re Wu)*, 173 B.R. 411, 413–15 (9th Cir. BAP 1994) (holding that commissions debtor insurance agent received on post-petition policy renewals were property of estate only to the extent the debtor's post-petition services were not a prerequisite to payment), and 5 Norton Bankruptcy Law And Practice 2d § 122:7 (2006) (noting that "[i]f termination payments under a contract for an insurance agency would not be subject to exemption under applicable nonbankruptcy law, then the termination payments must be valued for purposes of the best interests of creditors calculation.")

**20.** Debtors provide no support or analysis for this position, other than to simply state that because the funds are exempt under the tribal code, they necessarily constitute trust funds.

**21.** *See* H.R. 95–595, 95th Cong., 1st Sess., 176, 368 (1977), U.S.Code Cong. & Admin. News 1978, ¶¶ 5787, 6136, 6137, 6323, 6324.

**22.** *Farmers Coop. Co. v. Timken State Bank (In re Pechanec)*, 59 B.R. 899, 903 (Bankr.D.Kan. 1986) (citing *Sherman v. Havens*, 94 Kan. 654, 146 P. 1030 (1915) and *Watts v. McKay*, 160 Kan. 377, 162 P.2d 82 (1945)). *See also In re Estate of Sowers*, 1 Kan.App.2d 675, 680, 574 P.2d 224 (1977) (holding that "a spendthrift trust is a trust created to provide a fund for the maintenance of a beneficiary and at the same time to secure the fund against his improvidence or incapacity. Provisions against alienation of the trust fund by the voluntary act of the beneficiary or by his creditors are its usual incidents.")

**23.** *See In re Adams*, 302 B.R. 535 (6th Cir. BAP 2003) (holding that the debtors bear the burden of proving that property can be excluded from the estate pursuant to § 541(c)(2)).

**24.** *In re Wilcox*, 233 F.3d 899 (6th Cir.2000).

**25.** In addition, even if Debtors did hold an interest in a trust, they have failed to show that there is a restriction on the transferability of that interest. There is nothing in the record that supports a claim that the per capita distributions cannot be voluntarily transferred by competent adult members of the Tribe.

attached as an exhibit to the parties' stipulation, provides that 30% of the quarterly net gaming revenues received by the Tribe are to be divided equally among the members of the tribe.[26] The ordinance further provides that each payment shall be made within thirty days after the end of each calendar quarter by way of tribal check "made payable to the eligible tribal member, except in the case of incompetents or minors." Payments made to incompetent tribal members are made payable to the member's legal guardian, subject to certain requirements. Payments made to minors are "placed in trust and will be distributed to the minor with accumulated trust income on and after the 18th birthday."

The ordinance also provides rules for the operation of the trust created exclusively for minor tribal members, including a schedule for graduated payouts to those minors as they advance from age 18 to age 21, an allowance for early withdrawal for their "health, education, or welfare," as well as requirements for accounting of those specific trust funds.[27] In contrast, the ordinance places no such restriction, or "trust," upon the per capita payments to be made to competent,[28] adult members of the tribe, such as Debtor, Bonnie McDonald.

■ Debtors argue that the exemption contained in § 4–10–16 of the Tribal Code somehow creates a trust covering the property. Although the Tribe, through the Ordinance, clearly indicates that the per capita distributions are not subject to garnishment, attachment, execution, sale or other process under tribal law, it just as clearly does not impose a trust upon all of the per capita distributions. If the Court were to follow Debtors' argument in this case——that because the property is exempt, it is by definition also trust property, every piece of real or personal property that is exempt under state or federal law would have to likewise be considered trust property and excluded from the bankruptcy estate pursuant to § 541(c)(2), including wages, homesteads, automobiles, tools of the trade, etc. Property is not subject to a trust simply because a governmental entity has declared that property exempt from execution to satisfy a judgment.

Debtors further state, when arguing that the funds are subject to a trust, that "the tribe is well able to determine how [the gaming] revenues are distributed and whether they may be imposed with a trust." The Court agrees, and the Tribe did clearly elect to subject to a trust some members' right to immediately receive gaming revenues by explicitly requiring that eligible minor's payments be held in an express trust. The record is devoid, however, of any facts that suggest all per

---

**26.** The percentage of revenues available for payment of per capita distributions, which is ultimately divided between the eligible recipients, is subject to reduction by the Tribal Council, if needed.

**27.** "The IGRA does require that the tribe's allocation plan protect and preserve the interests of minors and other legally incompetent persons who are entitled to receive any of the per capita payments." *See* 25 U.S.C. § 2710(b)(3)(c) and *In re Kedrowski,* 284 B.R. at 443–44.

**28.** The term "legal incompetent" is defined as "an individual who is eligible to participate in a per capita payment and who has been declared to be under a legal disability, other than being a minor, by a court of competent jurisdiction, including tribal justice systems or as established by the tribe." *See* 25 C.F.R. § 290.2. The typical definition of "disability" includes "the inability to perform some function; an objectively measurable condition of impairment, physical or mental" and "incapacity in the eyes of the law." Black's Law Dictionary 474 (7th ed.1999). *In re Kedrowski,* 284 B.R. at 444.

capita distributions were subject to a trust.[29] In fact, the record demonstrates the opposite—the Tribe clearly knew how to impose a trust, and did so. Thus, the only per capita distributions that are subject to a trust are those that are to be paid to minors.[30]

## III. CONCLUSION

The Court finds that Debtors have failed to raise any valid defense to the Trustee's Motion for Turnover. Because the property in question was never held in joint tenancy or tenancy by the entirety, neither § 522(b) nor § 522(b)(2)(B) are applicable here. In addition, because Debtors' domicile is not within the boundaries of the Potawatomi reservation, they have no statutory basis for attempting to claim the exemptions that are provided for in the tribal code. Finally, the per capita distributions in question are not subject to any spendthrift or other trust for competent adult tribal members, like Debtor, Bonnie McDonald, and thus § 541(c)(2) is rendered inapplicable, as well.

**IT IS, THEREFORE, BY THE COURT ORDERED** that the Trustee's Motion for Turnover is granted. Debtors are ordered to forthwith turn over to the Trustee for administration any and all per capita distributions received subsequent to the Order of Conversion on November 14, 2005 that have not already been given to the Trustee, as well as the payment advices relative to those distributions, so the Trustee knows the exact amount of those distributions. Debtors are further ordered to turn over all future per capita distributions, and payment advices show-ing those distributions, within ten (10) days of their receipt, until all claims and expenses of this estate are paid, or further order of the Court.

---

**29.** As the *Kedrowski* court noted, "the narrow definition of 'legal incompetent' highlights the fact that the per capita distributions are intended to be exactly that-namely, payments to each tribal member, regardless of individual circumstance." 284 B.R. at 444.

**30.** Again, as the Wisconsin bankruptcy court noted, "there does not appear to be any authority for the tribe to restrict or prohibit the distribution to a particular tribal member" under IGRA. *Id.* at 443.