**In re Russell D. EVANS, Debtor.**

**No. 08–28291 EEB.**

United States Bankruptcy Court, D. Colorado.

March 23, 2011.

Andrew Snyder, Greenwood Village, CO, Jeffrey S. Brinen, Denver, CO, for Debtor.

Alan K. Motes, U.S. Trustee Program, Denver, CO, for Trustee.

## ORDER

ELIZABETH E. BROWN, Bankruptcy Judge.

THIS MATTER came before the Court on the Objection to the Debtor's Exemptions, filed by Cynthia Skeen, the Chapter 7 trustee (the "Trustee") and her related Motion for Turnover, which raise two related issues.[1] The first question is whether the distributions received by the Debtor from two closely-held businesses (the "Distributions") represent proceeds from the Debtor's stock interests and, therefore, are non-exempt property of the estate. The Debtor contends the post-petition Distributions represent "earnings" that are expressly excluded from estate property by § 541(a)(6).[2] The Trustee counters that, even if they are earnings, both the Debtor's Distributions and wages (collectively, Debtor's "Compensation"), received post-petition during the Chapter 11 case, became property of the estate by virtue of § 1115(a), recently enacted by BAPCPA.[3] The Debtor replies that the subsequent conversion to Chapter 7 caused his Compensation to revert to him under § 348(a). This second question, whether an individu-al debtor's Chapter 11 post-petition earnings revert to him upon a subsequent conversion to Chapter 7, raises an issue of first impression since the adoption of § 1115(a).[4]

## I. Background

### A. Debtor's Employment and Compensation

The Debtor has served as the President of Home Fresh Sandwich Distributors, Inc. and Home Fresh Bakery, Inc. since their inception. He owns 36.735% of Home Fresh Distributors and 39.545% of Home Fresh Bakery (collectively the "Companies"). The remaining shares of the Companies are owned by Kasey Conger and Bob Conger who served as the Vice President and Secretary/Treasurer, respectively. While acting as President, the Debtor performed substantial services for the Companies, and was expected to be available to work every day of the year, if necessary. The Congers, on the other hand, were passive investors and together they controlled the Companies' boards of directors (the "Boards").

From the time the Companies were formed as subchapter S corporations, approximately 15 years ago, the Debtor has received a compensation package in the

1. The Trustee's Objection to Exemptions is captioned "Objection to Schedule C and Amended Schedule C of Property Claimed as Exempt" found at Docket No. 227, and her Motion for Turnover is captioned "Motion to Compel Turnover and Notice" found at Docket No. 230.

2. All references to "Section" or "§ " shall refer to Title 11, United States Code, unless otherwise noted.

3. "BAPCPA" refers to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

4. While the parties brought these questions to hearing as an "exemption" dispute, they are more appropriately characterized as a request for a determination of the estate's interest in property. Nevertheless, neither party objected to proceeding by way of a motion instead of an adversary proceeding. The Court conducted a full evidentiary hearing on this matter. Thus, any procedural defect under Fed. R.Bankr.P. 7001 is deemed waived.

form of both wages and Distributions. From Ms. Congers' perspective, the Debtor's Distributions were "sweat equity" for his investment of time and talent. Although the Debtor and the Congers received distributions of profits in proportion to the amount of stock held, the Congers did not receive "compensation" for their services and their distributions were simply a return on their capital investments. The Debtor was the only one who actively worked for the Companies and he was the only one who received two forms of compensation.

The Companies issued W–2 Forms ("W–2s") reflecting the Debtor's "wages" or "salary" and Schedule K–1 Forms ("K–1s") showing Debtor's Distributions. In 2008, the Debtor received Distributions in the amount of $342,211 and wages of $91,070. In 2009, the Debtor received Distributions in the amount of $507,474 and wages in the amount of $99,220.99. The Companies did not withhold income taxes from the Distributions, and the Debtor reported them as ordinary business income, rather than dividends.

The Debtor testified that there were 14 other similarly-situated bakeries, and that the presidents of these bakeries earned annual salaries in the range of $400,000–$600,000. Ms. Conger acknowledged that the Debtor's salary, which was approximately $85,000 in 2008, was low and "not fair" in that it was significantly less than the salary paid to others serving in comparable positions. From her perspective, however, there was no distinction between what Debtor "took home at the end of the month" and his "income." The Congers knew that they could not retain Debtor's services absent the Distributions. The Debtor consistently requested a raise, but except for a small raise given to him about eight years ago, the Congers, through their control of the Boards, refused such

requests because they believed that tying the Debtor's Compensation to performance would ensure that he would stay with the Companies to protect his investment. In short, the higher the Companies' profits, the higher the take-home pay for Debtor. If the Companies were not profitable, then the Debtor's income would be limited to his salary. Ms. Conger admitted that she would not have performed the Debtor's job in the absence of the distribution-plus-salary compensation package.

## B. Debtor's Bankruptcy, Conversion and DIP Accounts

The Debtor filed an individual Chapter 11 petition on November 17, 2008. At the time of Debtor's bankruptcy, the Companies were operating under an exclusive contract with 7–Eleven, which generated approximately 90% of their revenues. In the spring of 2010, 7–Eleven notified the Companies that it would not renew its contract. Debtor knew that, without this contract, the Companies would not generate enough money to fund his Chapter 11 plan. On April 1, 2010, he converted his case to Chapter 7 (the "Conversion Date").

On the Conversion Date, the Debtor held three "debtor in possession" bank accounts (collectively the "DIP Accounts"). One account he used for the deposit of his Compensation and the payment of his living expenses (the "Operating Account"). It had a balance of $102,724.83 on the Conversion Date. Post-conversion, the Debtor turned over to the Trustee $92,934.90 of its balance (the "Turned Over Funds"), but expressly reserved his right to dispute that these funds were property of the estate. It appears that Debtor no longer has possession of any remaining balance in the Operating Account. He states that the $9,789.93 difference between the Turned Over Funds and the deposit balance on the Conversion Date

was depleted by a $6,000 tax deposit, for which the estate would have otherwise been liable, and by electronic payments, which had been long established to pay automatically certain regular living expenses. The Debtor opened the second DIP account to hold funds in escrow as part of a tentative settlement with one of the Debtor's primary lenders (the "Escrow Account"), but this settlement did not occur and, on the Conversion Date, the Escrow Account held only $495.95.[5] The Debtor established a third DIP account to hold what he believed were funds representing his exempt property (the "Exempt Account"), into which he transferred a portion of the funds from the Operating and Escrow Accounts, as well as a tax refund. On the Conversion Date, the Exempt Account held $186,141.17. Post-conversion, the Debtor turned over $51,533 from the Exempt Account, representing a refund of his 2008 federal income taxes ("2008 Refund"), which left an account balance of $134,608.17.

During the 16 months that Debtor was in Chapter 11, he received Distributions from the Companies totaling $508,382.35 and wages in the amount of $83,668.10, some or all of which he deposited into the DIP Accounts. The Trustee has noted that there were no Distributions deposited into the DIP Accounts for the months of March and April, 2010, and she has requested turnover of these unknown amounts as well. During this time frame, Debtor also received a small amount of income from other investments, noted as "miscellaneous assets" below, that was deposited into the DIP Accounts. Neither of the parties provided a breakdown of how much of each income source went into which account, and this Court is unaware of how much of the Conversion Date balances in each account are allocable to any one particular income source.

In her Motion for Turnover, the Trustee contends that *all* of the Debtor's post-petition income constitutes property of the estate subject to turnover. Therefore, she seeks turnover of the Conversion Date DIP Account balances less the funds already transferred to her (the Turned Over Funds and 2008 Refund), resulting in a net turnover request of $144,858.05. She further requests turnover of any other post-petition income that might not have been deposited into the DIP accounts. Based on the Debtor's belief that all of his Compensation constitutes "earnings for services" excluded from property of the estate, he not only objects to her turnover request, but he seeks the return of the Turned Over Funds.

## C. Miscellaneous Assets

The Trustee's Motion for Turnover and Objection to Exemptions also seek a ruling that three miscellaneous assets are nonexempt property of the estate that the Debtor must turnover. The first of these assets is a 2002 Cadillac Escalade (the "Cadillac"). In his schedules, the Debtor valued this car at $7,000 and he claimed a $5,000 exemption. The second asset is a 3% interest in "Stand Up MRI of America, LLC" ("MRI"). The MRI interest generated $6,874 in post-petition income. Finally, the third asset is a rental condominium in Aurora, Colorado (the "Rental"). During the Chapter 11 case, it generated $6,000 in income. It is unclear whether the $495.95 balance of the Escrow Account involves the same issues surrounding "earnings," and the Court will consider this account separately in regard to the "miscellaneous assets." Finally, the Debtor rather than the Trustee has requested a

---

**5.** There are discrepancies in the record as to whether the Escrow Account held $459.95 or $495.95, but the Court adopts $495.95 for purposes of this Order.

ruling on his entitlement to a portion of the 2008 Refund. He requests disgorgement of $6,212.19, representing 44/365ths of the 2008 Refund, which is the portion attributable to his post-petition tax liability.

## II. Discussion

### A. Are the Distributions "Earnings?"

▪ The first question before the Court is whether the Distributions represent non-exempt proceeds of the Debtor's stock interests or whether they are post-petition "earnings." To answer this question, the Trustee relies on Colo.Rev.Stat. § 13–54–104, which does not include distributions from closely-held corporations in its definition of "earnings." State law and other non-bankruptcy law may determine whether a debtor has a particular property interest. *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1341 (10th Cir.1998). But federal law determines whether that interest is included within the scope of "property of the estate" under § 541. *In re Builders Transp., Inc.*, 471 F.3d 1178, 1185 (11th Cir.2006); *Ogden v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1197 (10th Cir.2002).

▪ In looking to federal law, the inquiry must begin with the language of the statute itself. Under § 541(a)(1), the commencement of a bankruptcy case creates an estate that is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." Although § 541(a) uses broad language, its scope is *generally* limited to property interests held by the debtor on the petition date. This pre-petition limitation is then clarified by subsection (a)(6) to include all "proceeds, product, offspring, rents or profits of or from property of the estate...." 11 U.S.C. §§ 541(a)(6). However, § 546(a)(6) specifically *excludes* "earnings from services performed by an individual debtor after the commencement of the case" (the "Earnings Exception"). Thus, unless another statute requires otherwise, the Earnings Exception excludes an individual debtor's post-petition earnings from property of the estate. The exclusion of post-petition service income is consistent with the "fresh start" policy that, upon surrendering his property to the estate, the debtor should be given a "fresh start." See *In re Taronji*, 174 B.R. 964, 970 (Bankr.N.D.Ill.1994). Given the overall context of this statute and absent another Congressional directive, the use of the term "earnings" should be interpreted to foster a debtor's fresh start.

Federal courts construing "earnings" have long recognized that this term is not limited to "wages and salary." For example, in *Litzler v. Sholdra (In re Sholdra)*, 270 B.R. 64, 69 (Bankr.N.D.Tex.2001), the court noted that "Congress acts intentionally in its choice of words" and, had it intended to equate "earnings" with "wages and salary," it would have done so.

> Congress clearly intended by the term "earnings" something broader than salary or wages. Sections 503(b)(1)(A) and 507(a)(3)(A) refer to "wages, salary and commissions," and sections dealing with collective bargaining agreements make reference only to "wages." 11 U.S.C. § 1113(c), § 1167. On the other hand see Sections 1207(a)(2), 1306(a)(2) and § 522(d)(11)(E) of the Code which, like Section 541(a)(6), use the term "earnings."

> Reading "earnings" as broader in scope (or at least something other) than salary or wages is consistent with both the common meanings accorded the words and the meanings given in Black's Law Dictionary. Wages are paid for time

actually worked. Salary refers to a periodic payment for services rendered without regard to time worked. Earnings refers to all income generated by an individual.

*Id.* (footnotes omitted).

In *Sholdra,* the debtor-opthamologist's subchapter S corporation employed him, his wife, and a part-time clerk. It paid the debtor a salary, as well as distributions of profits, which he reported as ordinary income for tax purposes. The *Sholdra* court acknowledged that the tax treatment of income is one factor to consider in the overall analysis, but it is only one factor. Instead it recognized the need in cases of closely-held businesses, to analyze the portion of the "earnings" that are attributable to the debtor's services and the portion that must be allocated to the "enterprise value" of the business assets. In this case, because the debtor had presented evidence that the distributions were tied to his services, and the trustee produced no contrary evidence demonstrating that the distributions resulted from anything other than the debtor's services, the *Sholdra* court denied the trustee's motion for summary judgment.

The need to apportion the earnings between individual services of the debtor and the enterprise value of the closely-held business appeared in the seminal case of *In re FitzSimmons,* 725 F.2d 1208 (9th Cir.1984). In *FitzSimmons,* the Chapter 11 debtor-attorney operated a law practice as a sole proprietorship and employed other attorneys and support staff. The Ninth Circuit held that the Earnings Exception only excluded earnings attributable to services *"personally"* performed by the debtor and that, to the extent earnings were attributable to "the business' invested capital, accounts receivable, good will, employment contracts with the firm's staff, client relationships, fee agreements, or the like,"

such earnings accrued to the estate. *Id.* at 1211. *FitzSimmons* was decided before the addition of § 1115(a) to the Bankruptcy Code. In the absence of a provision like § 1115(a), the bankruptcy court had struggled with the proper amount of business income that could be utilized by the debtor for his personal needs versus the amount that had to be contributed to the sole proprietorship for its reorganization. It had set a arbitrary allowance of $3,500 per month that the debtor was allowed to draw from the business for personal use. It had not considered a division of the business income based on the amount attributable to the debtor's personal services. The Ninth Circuit remanded the case to the bankruptcy court for an analysis of the portion of the practice's earnings attributable to the debtor's personal efforts and to exclude that amount from the estate under the Earnings Exception. Following *FitzSimmons,* most courts have required evidence of the appropriate division of revenue into these two component parts. See *In re Prince,* 85 F.3d 314 (7th Cir.1996); *In re Angobaldo,* 160 B.R. 140 (Bankr. N.D.Cal.1993); *In re Cooley,* 87 B.R. 432 (Bankr.S.D.Tex.1988).

The facts of the *Cooley* case, however, caused the court to question the Ninth Circuit's addition of the word "personal" into the Earnings Exception, when it said that the debtor could only exclude earnings for services "personally" performed by the debtor. In *Cooley,* the Chapter 11 debtor was a world-renowned surgeon, who employed five associate surgeons and various staff. Because he was the business' "rainmaker," responsible for most of the referrals to the associate surgeons, and he performed substantial administrative duties, the debtor sought to exclude all post-petition earnings derived from the sole proprietorship. Under these circumstances, the *Cooley* court agreed that the

phrase "services performed by an individual debtor" must be more liberally construed, reasoning that the debtor "earned" revenues beyond the surgeries in which he personally assisted. While acknowledging the inherent difficulty in attempting to breakdown the earnings into the two components, it provided an analysis of the respective burdens of proof of the parties. It held that the debtor had the burden of going forward with evidence of the application of the Earnings Exception, by requiring a showing that: "(1) the debtor is an individual, (2) who performs services, (3) which generate earnings, (4) postpetition." *Cooley,* 87 B.R. at 441. Upon this showing, the *Cooley* court found that the burden then shifts to, and remains on, the opposing party to show that the "earnings" are in actuality "proceeds, product, offspring, rents [or] profits derived from those assets or other property interests which have previously accrued to the estate by operation of Section 541." *Id.* It found that placing the burden on the party opposing the debtor's retention of "earnings" "seems best to guard against the potential conflict with the prohibition against involuntary servitude and to ensure protection of an individual's fresh start." *Id.*

Not all courts that have considered the scope of the Earning Exception have placed the burden of proof on the opposing party. In *In re Moyer,* 421 B.R. 587 (Bankr.S.D.Ga.2007), the debtor owned an ambulance company and supervised more than 120 employees. There, the court considered whether the post-petition appreciation in subchapter S corporation stock held by the debtor was attributable to his services and therefore excluded under the Earnings Exception. The *Moyer* court acknowledged that, in cases that involve professional services businesses, the "individual financial production is more easily traceable and extractable from the production of the whole." *Id.* at 593. Because the *Moyer* debtor failed to identify any specific post-petition services he had performed that had increased the value of the stock, the court held that the appreciation was attributable to more than the debtor's services. *Id.* at 592. Without explicitly stating so, the *Moyer* court placed the burden of proof on the debtor. Perhaps this was the case because the Earnings Exception arose—not in the context of entitlement to a distribution or stock dividend—but in the context of the trustee's attempt to sell the stock itself, which was presumptively estate property.

■ Whether the Earnings Exception issue in this case is considered in the context of a turnover proceeding or an exemption objection, the burden of proof rests with the Trustee. Fed.R.Bankr.P. 4003(c) (the objecting party bears the burden of proving the exemption is not properly claimed). Some courts describe the standard of proof in turnover proceedings in terms of "shifting burdens." *See Gorenz v. State of Ill. Dep't Of Agric. (In re Gorenz),* 653 F.2d 1179, 1184 (7th Cir. 1981). A trustee has the initial burden of establishing a *prima facie* case. Although the burden shifts to the debtor to provide an explanation, the ultimate burden of persuasion remains on the trustee at all times. *In re Gorenz,* 653 F.2d at 1184; *In re Meyers,* 616 F.3d 626, 629 (7th Cir.2010) (placing "imprimatur" on *Gorenz* burden shifting approach under the Bankruptcy Code); *Express Am., Inc. v. Sivley (In re Express Am.),* 130 B.R. 196, 198 (Bankr. W.D.Pa.1991); *In re McDonald,* 353 B.R. 287, 290 (Bankr.D.Kan.2006); *Mather v. Tailored Fabrics, Inc. (In re Himes),* 179 B.R. 279, 282 (Bankr.E.D.Okla.1995). "The quantum of evidence necessary to satisfy the trustee's burden of persuasion will necessarily vary according to circum-

stances of individual cases." *In re Gorenz,* 653 F.2d at 1184.

■ The Debtor satisfied his burden that the Earnings Exception applied in this case. He testified that he supervised the Companies' bakery business, which operated 365 days per year for 17 years. He testified, without objection, that there were 14 similarly-situated bakery businesses, and that the presidents of these bakeries received average annual salaries of $400,000–$600,000. Rather than receiving an outright salary within this range, the Debtor received a "compensation package" that included both salary and distributions. Collectively, these amounts totaled $433,281 in 2008 and $606,695 in 2009. The Debtor periodically requested that the Boards increase his actual "salary," but his requests were consistently denied. Ms. Conger testified on behalf of the Boards that they wanted to keep the Debtor motivated to build the businesses by tying his compensation to the profitability of the Companies, much like a compensation structure based on commissions.

The Court recognizes that this case does not involve a professional services company like the debtors in *FitzSimmons* and *Cooley.* The Debtor employed and supervised around 150 employees who contributed in some way to the Companies' profits. In addition, the Companies made distributions to all three shareholders, including those to the Debtor, based on the amount of stock each held. The Court received no evidence as to the amount of capital each shareholder had contributed to acquire stock and whether the Debtor's contribution was tied solely to his "sweat equity." These facts indicate that at least some portion of the Distributions are likely attributable to the "enterprise value."

The outcome in this case then rests on who carries the ultimate burden of persuasion. The Trustee did not dispute the Debtor's or Ms. Conger's testimony that they considered the Distributions to be part of the Debtor's compensation. The Trustee did not dispute the Debtor's evidence as to the salary of similarly-situated professionals. Nor did she present any evidence or argue that a portion of the Debtor's Distributions should be attributable to the services of the 150 individuals employed by the Companies. In other words, the Trustee did not attempt in any way to allocate the Distributions into the two component parts, those attributable to the Debtor's services and those related to the enterprise value. Holding that the Trustee had the burden of proof on this issue, and that this burden was not satisfied, the Court has no choice but to rule in the Debtor's favor that the entirety of the Distributions constitute "earnings."

## B. Did the Debtor Lose Entitlement to the Earnings?

■ At the outset of this discussion, the Court stated that, unless another statute requires otherwise, the Earnings Exception excludes an individual debtor's post-petition earnings from property of the estate. In each of the chapters that allow for the reorganization of an individual debtor, Chapters 11, 12, and 13, there is an express Congressional directive that post-petition earnings of the debtor are included in property of the estate. In Chapter 13 cases, § 1306(a)(2) pulls into the estate all "earnings from services performed by the debtor after the commencement of the case. . . ." Section 1207(a)(2) contains similar language applicable to Chapter 12 cases. For many years, there was no express corollary provision in Chapter 11 reorganization cases. Then, in 2005, BAPCPA added § 1115(a)(2), which now expressly includes an individual Chapter 11 debtor's "earnings from services performed by the debtor after commencement

of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first." As a result, the Distributions—received by the Debtor after he filed a Chapter 11 petition and before conversion to a Chapter 7 case—became property of the estate, notwithstanding the Earnings Exception. The question then becomes whether the Distributions revert to the Debtor on conversion.

Section 348 governs the effect of conversions. Subsection (a) sets forth the general principle that "conversion of a case ... constitutes an order for relief under the chapter to which the case is converted, but ... *does not effect a change in the date of the filing of the petition, the commencement of the case,* or the order for relief." 11 U.S.C. § 348(a) (emphasis added). Interpreting this language, the Tenth Circuit has excluded property acquired post-petition during a Chapter 11 case from property of the Chapter 7 estate, following a conversion. *Casey v. Hochman,* 963 F.2d 1347 (10th Cir.1992). In *Hochman,* the Chapter 11 debtor had invented a new device and acquired patents for it. On conversion to Chapter 7, the *Hochman* court returned this post-petition invention to the debtor. The Tenth Circuit interpreted this general language to mean that "property of the estate" under § 541 is to be re-assessed and determined as of the original petition date following a conversion from another chapter to a Chapter 7 case.

This plain language reading of the law is consistent with the treatment of post-petition "earnings" in Chapter 13 reorganizations, where Congress has considered an analogous question to the one presented here. Section 1306(a)(2) is identical to § 1115(a)(2) except that it references conversions from Chapter13 to 7. Section 1306(a)(2) pre-dates § 1115(a)(2), and for

years, courts had been divided as to how post-petition earnings were to be treated in the event a Chapter 13 case were converted to Chapter 7. Two lines of cases developed as to the appropriate date for determining what would be considered "property of the estate" in a converted case. Some courts held that, upon conversion from Chapter 13 to 7, the date of conversion would control and all property of the Chapter 13 estate, including after-acquired property pursuant to § 1306(a), would be included in the Chapter 7 estate. *In re Lybrook,* 951 F.2d 136, 138 (7th Cir.1991) (holding "the Chapter 13 estate passes unaltered into Chapter 7 upon conversion."). See *Armstrong v. Lindberg (In re Lindberg),* 735 F.2d 1087, 1090 (8th Cir.1984) (holding the date of conversion, and not date of filing of the original Chapter 13 petition, determines what exemptions may be claimed); *In re Calder,* 973 F.2d 862, 866 (10th Cir.1992). Other courts held that the original petition date would control, meaning that a debtor's "earnings" acquired after the petition date would be excluded by the Earnings Exception, even though § 1306(a) would have included them up to the conversion date. See *In re Bobroff,* 766 F.2d 797 (3d Cir. 1985); *In re Horton,* 130 B.R. 326, 328 (Bankr.D.Colo.1991); *In re Gorski,* 85 B.R. 155 (Bankr.M.D.Fla.1988).

In 1994, Congress resolved this split by amending § 348 to add subsection (f)(1)(A). It provides that "when a case under chapter 13 ... is converted to a case under another chapter ... property of the estate in the converted case shall consist of property of the estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on the date of conversion." 11 U.S.C. § 348(f)(1)(A). This section expressly excludes a debtor's post-petition earnings from property of a Chapter 7

estate upon conversion from Chapter 13, despite § 1306's inclusion of such earnings in the estate during the Chapter 13 case.

When Congress enacted § 348(f), the legislative history specifically acknowledged this split in authority. H.R. Rep. 103–835, *reprinted in* 1994 U.S.C.C.A.N. 3340, 3366. It clearly intended to abrogate the rationale underlying the *Lybrook* line of cases. *Id.* In doing so, it explained that its purpose was to equalize the treatment a debtor would receive under a Chapter 13 case converted to Chapter 7, with the treatment that debtor would have received if he had originally filed under Chapter 7.

> These latter courts [limiting estate property on conversion to exclude post-petition earnings] have noted that to hold otherwise would create a serious disincentive to chapter 13 filings. For example, a debtor who had $10,000 equity in a home at the beginning of the case, in a State with a $10,000 homestead exemption, would have to be counseled concerning the risk that after he or she paid off a $10,000 second mortgage in the chapter 13 case, creating $10,000 in equity, there would be a risk that the home could be lost if the case were converted to chapter 7 (which can occur involuntarily). If all of the debtor's property at the time of conversion is property of the chapter 7 estate, the trustee would sell the home, to realize the $10,000 in equity for the unsecured creditors and the debtor would lose the home.

*Id.* See also *In re Pisculli*, 426 B.R. 52, 63–64 (E.D.N.Y.2010) (and cases cited therein).

As previously mentioned, until 2005, Chapter 11 did not have a counterpart to § 1306 or § 1207. When Congress enacted § 1115(a)(2) as part of the sweeping changes to the Bankruptcy Code in BAPCPA in 2005, it did not simultaneously amend § 348 to expressly provide for the same treatment of post-petition income in cases converting from Chapter 11 to Chapter 7. The Trustee argues that Congress' failure to enact an analogous provision in § 348 reflects Congress's intent that such earnings remain in the estate.

The Trustee's position finds support in the rule of statutory construction known as *expressio unius est exclusio alterius.* Under this maxim, when the "persons and things to which [a statute] refers are designated, there is an inference that all omissions should be understood as exclusions." 2A Norman J. Singer, J.D. Shambie Singer, Statutes and Statutory Construction § 47:23 (7th ed. 2007). By referring only to Chapter 13 cases in § 348(f), and omitting any reference to Chapters 11 and 12, this maxim would counsel the Court to find that the omission was intentional and signals Congressional intent to leave post-petition Chapter 11 and 12 earnings in the estate upon conversion to Chapter 7. But a maxim is only intended to aid in finding the legislature's intent. It is "subordinate to the primary rule that the legislative intent governs the interpretation of the statute. Thus, it can be overcome by a strong indication of contrary legislative intent or policy." *Id.* "This maxim has been held to be 'inapplicable if there is some special reason for mentioning one thing and none for mentioning another which is otherwise within the statute.'" *Id.* Thus, it is also possible to interpret the specific reference to Chapter 13 cases in § 348(f) as necessary to resolve a split of authority that had arisen only in cases converted from Chapter 13 to Chapter 7. Otherwise the general language

of § 348(a) was sufficient to convey the message in all other contexts.

▮ In addition, this maxim "will be disregarded and an expanded meaning given where an expanded interpretation will accomplish beneficial results, where its application would thwart legislative intent made apparent by the entire act...." *Id.* When Congress adopted § 348(f), there was no counterpart to § 1306 in Chapter 11. At that time, Congress clearly conveyed its purpose to avoid penalizing debtors who first attempt a repayment plan. This same rationale is equally applicable in Chapter 11 reorganization cases converted to a liquidation under Chapter 7. If the conversion date were the controlling date, then debtors for whom a reorganization case ultimately proved unavailing, would be disadvantaged in their Chapter 7 case because of their voluntary attempt to repay their creditors through reorganization. This cannot be what Congress intended. As many courts recognized before the adoption of § 348(f), one of the Bankruptcy Code's goals is to encourage use of debtor repayment plans rather than liquidation. *In re Bobroff,* 766 F.2d 797, 803 (3d Cir.1985) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 118 (1977), 1978 U.S.Code Cong. & Admin News pp. 5963, 6078). There is no policy reason as to "why the creditors should not be put back in precisely the same position as they would have been had the debtor never sought to repay his debts...." *In re Bobroff,* 766 F.2d at 803 (citing *In re Hannan,* 24 B.R. 691, 692 (Bankr.E.D.N.Y. 1982)). Consequently, there is no reasoned basis to treat Chapter 11 and 12 cases differently than Chapter 13 cases. Absent a binding precedent to the contrary, this Court will not interpret § 348 as requiring a different result in a conversion from a Chapter 13 case rather than from a Chapter 11 or 12 case.

## C. Miscellaneous Assets

▮ As frequently happens at trial, parties become so embroiled in whatever are the main points of contention that they neglect to present evidence or make arguments regarding other elements of their case. This is what happened with the "miscellaneous assets." In regard to the Cadillac, the Debtor had claimed a $5,000 exemption in what he valued as a $7,000 car. In her Objection, the Trustee disputed its value, claiming it was worth "substantially more than $5,000." At trial, neither party presented any evidence of its value. Resolution of this matter then hinges on which party had the burden of proof. Unfortunately for the trustee, the question of who carries the burden has been long settled in the exemption context. "Once a debtor claims an exemption, the objecting party bears the burden of proving the exemption is not properly claimed." *In re Lampe,* 331 F.3d 750, 754 (10th Cir.2003); Fed.R.Bankr.P. 4003(c).

This Court recognizes that the Supreme Court recently ruled in *Schwab v. Reilly,* —— U.S. ——, 130 S.Ct. 2652, 177 L.Ed.2d 234 (2010) that, despite the expiration of the applicable objection deadline, an objector may dispute, and the estate may recover the non-exempt portion of, an asset's actual value even though the debtor had claimed it as fully exempt on her schedules. But even though the Supreme Court has allowed objectors to bring a late objection to the value of the asset, this Court is unwilling to extend this "Johnny-come-lately" approach beyond the date of trial on the valuation issue. Unless the Supreme Court is willing to reconsider basic principles of *res judicata* and collateral estoppel, there must be finality at some point. Given no contrary valuation evidence, the Debtor's scheduled value of $7,000 is adopted by the Court. Accord-

ingly, the Debtor must either pay the $2,000 non-exempt portion of its value to the Trustee or surrender the car to the Trustee for sale, with his right to receive $5,000 of its proceeds.

■ The Court turns next to the Trustee's request for two assets that the Debtor did not oppose. First, the Trustee requested turnover of the income from the Rental. The Debtor did not claim an exemption in the Rental. No one disputed that the Debtor received income attributable to the Rental during the Chapter 11 case in the amount of $6,000. The Court is aware from another pending motion in this case that the Debtor's former spouse will not receive the Rental as part of the property settlement in the divorce. On the other hand, no one produced any evidence that would allow the Court to trace the Rental income to either the existing balance of the DIP Accounts or that of the Turned Over Funds. But the Debtor did not oppose the inclusion of this asset and its income in property of the estate. Similarly, the Debtor did not oppose the Trustee's request for turnover of the balance of the Escrow Account. As a result, both amounts should be turned over to the Trustee or offset against the Trustee's obligation to disgorge the Turned Over Funds.

At hearing, the Debtor did not assert his entitlement to the post-petition income attributable to the MRI interest. He did not dispute the Trustee's characterization of the MRI interest and income attributable to it as pre-petition assets of the estate rather than "earnings." The Court notes, however, that the Debtor's former spouse, Ms. Roberta Evans, has obtained an order from the divorce court, awarding her the membership interest in MRI as part of the division of marital property.

The Trustee has objected to Ms. Evans attempt to obtain approval from this Court of her divorce settlement. The competing claims of Ms. Evans and the Trustee to the MRI interest and its proceeds will be addressed in a separate Order in connection with the pending settlement motion, filed by Ms. Evans. For purposes of the present motions, which pertain to claims between the Trustee and the Debtor only, the Court notes that the Debtor has no further claim to the MRI interest and its proceeds. Certainly, he has no basis for an exemption in either. Whether the Trustee may obtain turnover of these assets will be addressed in connection with the settlement motion.

■ This leaves one final miscellaneous asset, the portion of the 2008 Refund attributable to post-petition wages. The Debtor does not dispute that the portion of this refund related to his pre-petition wages is property of the estate and he has turned over the entire 2008 Refund to the Trustee. He is only asking for a return or offset of the post-petition portion in the amount of $6,212.19. Section 1115(a)(1) brings into property of the estate "all property" acquired post-petition, which would include all of the 2008 Refund. Whether it reverts to the Debtor on conversion of the Chapter 11 case to a Chapter 7 by operation of § 348(a) is the same question addressed in connection with the Compensation issue above. At least one court has held that, on conversion, the Chapter 7 estate only includes the pre-petition portion of the refund, despite the passage of § 1115(a). *See, e.g., Taylor v. Burns*, 344 B.R. 523 (W.D.Ky.2004). In this case, on the basis of the Court's prior analysis above, the Court holds that the Debtor is entitled to either a return of $6,212.19 or an offset in that amount.

Based on the rulings above, the net amount that the Trustee may retain of the funds she is presently holding from the DIP Accounts and 2008 Refund is $60,690.76. This figure represents the estate's entitlement to: (1) the pre-petition portion of the 2008 Refund in the amount of $45,320.81; (2) $2,000 non-exempt portion of the Cadillac; (3) the Rental income of $6,000; (4) the MRI income in the amount of $6,874, which must be held pending further court order; and (5) the Escrow Account balance of $495.95. Based on the figures presented at trial, the Trustee received the Turned Over Funds in the amount of $92,934.90 from the Operating Account, which contained in substantial part the Debtor's Compensation, and $51,533 attributable to the 2008 Refund, or a total of $144,467.90. From this amount, she must now disgorge to the Debtor the difference between this total and the $60,690.76 awarded to her in this Order, or $83,777.14.

## III. Conclusion

For the reasons stated, the Trustee's Exemption Objection is SUSTAINED in part and OVERRULED in part. Her Motion to Compel is GRANTED in part and DENIED in part. After offsetting the liability owed by each party, the net result is that the Trustee must DISGORGE to the Debtor $83,777.14.